## S. H. BARONS, *et al.*, v. N. B. BROWN, *et al.*

1. TELEGRAM, COPY AND CONTENTS OF, *as Evidence*. Where the controversy is not between the sender and the person to whom a telegram is addressed, and the contents of such message are material, the original message, if not lost or destroyed, must be produced, it being the best evidence; and in case of its loss, or inability to produce it from other cause, the next best evidence the nature of the case will admit of must be furnished. If there is a copy of the message existing, it should be produced; if not, then the contents of the message should be shown by parol testimony.

2. PRELIMINARY PROOF, *Insufficient; Book Entry as Evidence*. Where the telegraph operator, having the possession of the books and papers of the office at C., testified there were not in his office any of the messages forwarded from the office on April 26th, 1878, but he *supposed* all such messages had been destroyed, as it was the custom to destroy them after six months, and then presented a book of the office which he said he *supposed* was in the handwriting of the operator who preceded him at

the office, *held,* that the preliminary proof was insufficient to authorize the introduction of secondary evidence of the contents of the message in question. *Held, further,* That as the only entry or memorandum in the book concerning the *supposed* destroyed message was as follows: "H. & B. to Q. M. & Co., Kansas City — nine words," such entry was inadmissible as original or other evidence. *Held, also,* As the book was not an account or shop-book, or any register or record recognized by law as evidence, it was error to admit it, or the entries therein, for the consideration of the jury; and its admission in this case, having been highly prejudicial to the defendants, is sufficient cause for the reversal of the judgment.

3. BOOK-ENTRY, *How Used by Witness.* If the original message could not be produced, and if no copy of such message existed, the person making such entries in the office-book, when called upon to testify to the contents of the message, might have used the book to refresh his memory concerning the messages sent from the office while he was operator.

*Error from Cloud District Court.*

ACTION brought by *Brown* and another, partners as N. B. Brown & Co., against *Barons* and four others, to recover $1,000 with interest. Trial at the October Term, 1879, of the district court, and judgment for the plaintiffs. The defendants bring the case here. The opinion states the facts.

*L. J. Crans,* and *F. W. Borton,* for plaintiffs in error.

*F. W. Sturges,* for defendants in error.

The opinion of the court was delivered by

HORTON, C. J.: It is objected that the petition below does not state facts sufficient to constitute a cause of action. A general denial was filed, and the objection was made for the first time in the court below by a motion to exclude all evidence. Such an objection is never favored, and will prevail only when there is a total failure to allege some matter essential to the relief sought. The petition states somewhat informally, according to the old system of pleading, "common counts," for money lent and money paid, also a formal count for money had and received. The pleading is sufficient, and hence the objection was properly overruled. (*Meagher v. Morgan,* 3 Kas. 372; *Barkley v. State,* 15 Kas. 99.)

The second error assigned in the record is based upon the admission of certain testimony of one of the plaintiffs. The question was, "Did Huntington & Barons notify Quinlin, Montgomery & Co. as to the draft?" The witness answered: "Huntington told me he had sent a telegraphic dispatch in the name of Huntington & Barons, to Quinlin, Montgomery & Co., that they had drawn on them." The question was proper, because any action of Barons, of the firm of Upton, Barons & Co., alone, or in connection with Huntington, concerning the draft, was some evidence to go to the jury tending to prove the liability of Barons, or Upton, Barons & Co., for the money obtained by Huntington on April 26th, 1878. The testimony in answer to the question was, however, improper. Neither Barons, nor the firm of Upton, Barons & Co., was chargeable with the statement of Huntington, or with his conduct in transmitting a telegram to Quinlin, Montgomery & Co., in their absence, and without their consent. Huntington had made default, and the evidence was not needed to charge him. The remedy of the defendant was by a motion to strike out such answer. No such action was taken. The only ruling objected to was to the question propounded. The court therefore committed no error in overruling the same. (*Stone v. Bird*, 16 Kas. 488; *City of Wyandotte v. Gibson*, ante, p. 236.)

The third error assigned consisted in the admission of certain secondary evidence tending to prove in a very faint manner the contents or a part of the contents of the telegraphic message sent to Quinlin, Montgomery & Co., of Kansas City, Missouri, by Huntington, on April 26th, 1878. In order to lay the foundation of this evidence, plaintiffs introduced the witness Charles Thomas, who testified as follows:

"I am the telegraph operator at Concordia, and have charge of the office, books and papers; there are not in the office any of the dispatches which were forwarded from this office on April 26th, 1878. I *suppose* they have all been destroyed, as it is the custom to destroy them after six months. I have with me the books of the Concordia office. *I had not charge of* and was not about the office in April, 1878. The entries

in these books for that month are not in my handwriting, but are, I suppose, in the handwriting of the operator who preceded me."

The witness was then asked to read from the book what message was sent from the office on the 26th of April, 1878. Defendants objected on the ground that the preliminary proof was not sufficient to let in such evidence, and because of its incompetency and irrelevancy. The court overruled the objection, and permitted the book to be offered in evidence. The witness then read from the book: "H. & B. to Q. M. & Co., Kansas City — nine words." The evidence was wholly inadmissible. The witness had no knowledge of the destruction of the original message left in the office. He merely *supposed* it had been destroyed, as it was the custom so to do after six months; and more than six months had expired. He did not testify that it was the custom to keep the originals in the office until destroyed, or when or where the original was sent, or where or by whom it was destroyed. This evidence was insufficient as preliminary to the introduction of the book, as the plaintiffs had not "shown that they had in good faith exhausted, in a reasonable degree, all the sources of information and means of discovery which the nature of the case would have naturally suggested, and which were accessible to them." Before secondary evidence can be admitted of a lost paper, or one alleged to have been destroyed, evidence of the person who was the proper custodian of it, as to its loss or destruction, must be adduced. (*Brock v. Cottingham*, 24 Kas. 383.) If the original had been destroyed at the office in Concordia, evidence of that fact must have been easily obtainable. If it had been sent away to some central office of the telegraph company, the person having the custody of the message at its destination would have been a good witness to that fact. But independent of all this, the book was not the best evidence of the contents of the message. It really was no competent evidence at all. The book was not an account or shop-book, or any record recognized by the law as admissible in evidence. The person making the memorandum in the

book might have used it to refresh his recollection, if no better evidence existed of the contents, and he had been called as a witness; but the book itself was inadmissible. Plaintiff should have shown the loss or destruction of the original by competent evidence, if the message had been actually lost or destroyed, and then proved, if possible, the contents thereof by a copy, if one existed; if not, by some witness who had seen and read the original. In the absence of better evidence, the copy taken off the wires at Kansas City might have been introduced. If nothing could be shown of such contents by the employés of the telegraph company at Concordia, or by any other witness, then some attempt ought to have been made to have proved the contents by the employés of the company at Kansas City, or by Quinlin, Montgomery & Co., of that city. This is not a case concerning the sender and the person to whom the message was addressed, and therefore the message received by the person addressed cannot be regarded as the original.

The evidence having been improperly admitted, the next question to be considered is, whether its admission was sufficiently prejudicial to demand a reversal of the judgment. It appears from the evidence, that on April 26th, 1878, there was a firm engaged in the cattle business in Cloud county, of the style of Upton, Barons & Co.; that on the said 26th day of April, the defendant, J. G. Huntington, obtained from the plaintiffs, Brown & Co., the sum of $1,000, for which Huntington drew a draft in his own name in favor of Brown & Co. on Quinlin, Montgomery & Co., commission-men of Kansas City. The money was used in paying for a drove of cattle, which Brown & Co. were given to understand would be shipped to Quinlin, Montgomery & Co., and that they would sell the cattle and pay the draft out of the proceeds of the cattle. The cattle were shipped, however, in the name of Laird & Johnson. Therefore Quinlin, Montgomery & Co., having no money belonging to Huntington, and having no security on the cattle to reimburse them, refused to pay the draft which had been drawn by Huntington in favor of

Brown & Co., and it came back to Brown & Co. unpaid. Huntington did not deny his own liability, but Brown & Co. claimed that Upton, Barons & Co. were also liable, and that Huntington was a member of the firm. Brown testified:

"In the latter part of March or first of April, 1878, I had a conversation in the back room in the bank with Huntington. He told me he was a member of Upton, Barons & Co., consisting of Upton, Barons, Pomeroy, Ellis and himself; that they were feeding cattle in this and adjoining counties; that the firm was wealthy, worth a quarter of a million or more; that they were feeding twelve or thirteen hundred head in this, Mitchell and Riley counties; that as a railroad had come here they expected to ship from here; that they did not carry much currency with them; that they kept it in bank at Manhattan; that they borrowed only for a few days; that they would want money, and asked if they could get it. I said they could. The next talk was sometime in April, toward the middle. It was raining the night before. It was about nine or half-past nine o'clock. Huntington and I talked. Barons came up; he introduced Barons to me; it may have been the 20th. He told me who Mr. Barons was, that he was of New York, and a member of their firm. I had a talk with Barons, and told him what Huntington had told me, and asked him if Huntington was a member of the firm; he said he was, was doing the western business. I asked him if it would be all right to let Huntington have money for the firm, and he said it would, and that Huntington 'had told him he had sent a telegraphic dispatch in the name of Huntington and Barons to Quinlin, Montgomery & Co. that they had drawn on them.' The next time I saw Huntington was the day when I let them have the money."

Other testimony was introduced to sustain these statements. On the defense, Barons testified:

"I had no interest of any kind in the purchase of Laird & Johnson's cattle. Huntington was not in any way connected with our firm, or employed by us. Wright was complaining of Huntington not having sufficient hands to drive the cattle, and I helped Wright to take one bunch of cattle from Concordia to Clifton. I went on the train which took these cattle down as far as Manhattan, where I got off and attended to some business, and then took the express to Kansas City. I got nothing for what I did in assisting to drive these cattle.

I did as any other cattle-man would who was going the same way — a neighborly act. I did not, at any time in April, 1878, authorize Huntington to do anything for our firm or for any of us. I made no negotiations whatever with Brown & Co., on April 26th or at any other time, for money. Neither I nor my firm have had at any time any transaction with them. I first became acquainted with Mr. Brown in the spring of 1878. I was then introduced by Mr. Huntington, on the cross-walk near the bank. Mr. Huntington, in introducing me, named me as Mr. Barons, of the firm of Upton, Barons & Co. I was in a hurry: I don't think we said much if anything more. I was never so introduced again, on the steps of the bank or elsewhere. Mr. Brown never asked me if I was a member of Upton, Barons & Co., anywhere; neither in front of Allen's nor elsewhere. Some time after all this, Mr. Brown came up to me on the street and shook hands with me. I did not recognize him at first. He asked me if I was going to pay the thousand dollars that Huntington got. I told him I was not. This was about the middle of May, 1878. I have been in my present business for about three years past. I never borrowed money to buy with. I always bought for cash, or by draft on Walker at Beloit or on the bank at Manhattan, or by using certified checks, which I generally carried with me. We did not borrow money. Huntington was never a partner of Upton & Barons, of Upton, Barons & Co., or of myself. I never told Mr. Brown that Huntington was a member of our firm. I never told Mr. Brown that if he let him have the money it would be all right. I never used any such language to Brown."

Huntington testified for defense:

"I was in Concordia April 26, 1878. On that day I purchased a lot of cattle from Laird & Johnson. I purchased them for myself; neither Mr. Barons nor any member of the firm of Upton, Barons & Co., had any interest in the purchase. On that day I borrowed from N. B. Brown & Co. $1,000, and gave them a sight draft on Quinlin, Montgomery & Co., of Kansas City, for the amount. It is the same draft which has been shown here. It was given for money I paid to Laird & Johnson. The draft has not been paid, because the cattle did not pay out, and I was unable to pay. I owe it yet. When I got the money I intended to ship in my name to Quinlin, Montgomery & Co., and Laird & Johnson were to have gone down with me to Kansas City to get

-the balance I owed them. We drove the cattle to · Clifton, and Laird & Johnson required me to ship in their name. I went with the cattle to Kansas City and Chicago. They did not pay out by about nine hundred and forty-eight dollars. The market had dropped between the time we shipped and when we reached Kansas City. I tried to get Quinlin, Montgomery & Co., and others, to pay the draft and pay out, but they thought there was not enough money in them. I then got an advance of five hundred dollars and shipped to Chicago. When I returned, I went immediately through to Jewell county for a lot of cattle which were on the road, and which I had contracted to deliver. There were some two hundred head. I had them with me, and when I reached Concordia I heard that Mr. Brown said he wanted to see me, and I went at once to his bank. We had a talk about the matter. I thought when I purchased the cattle, that the Kansas Pacific would see me out; and when I was talking to Brown on Sunday I learned that he had a warrant for me. I wanted him to go down to Kansas City with me to see the company, and said I would pay his expenses down, and what expense he had been at. He went down with me. I could do nothing there. When we were at the stock-yard at the fence, Mr. Brown said to me that he would give me fifty dollars if I would say that Barons was interested in it, and fix it on the firm. I told him that I was poor, but I was honest, and I could not and would not do that. I never was a member of the firm of Upton, Barons & Co. Did no business for that firm. I never told Mr. Brown or anyone else that I was a member of the firm of Upton & Barons, or of Upton, Barons & Co. I never introduced Mr. Barons to Mr. Brown as one of our firm. I never used that language to anyone, or language conveying that impression. On the day I borrowed the money, I sent a telegram to Quinlin, Montgomery & Co., telling them that I had drawn on them. I do not know how that dispatch was signed. I cannot say how the dispatch was signed. If I saw it, I could tell whether I sent it or not. My meeting with Mr. Barons at Beloit was accidental. I met him in Concordia by appointment. He was to get his horse here, which I had promised to bring down from Beloit."

From these extracts it is evident the testimony as to the liability of Barons, or Upton, Barons & Co., was very conflicting. Slight evidence on either side would naturally

27 — 25 KAS.

affect the jury in such a case; certainly it would have some influence. The objectionable testimony tended to support the statements of Brown that Huntington and Barons were together in the cattle and money transaction, and also tended to show that Huntington telegraphed to Q. M. & Co., under the initials of H. & B., or that he signed the telegram "Huntington & Barons." This testimony therefore tended to lessen the force of his evidence for the defense, that Upton, Barons & Co. had nothing to do either with the purchase, of the cattle from Laird & Johnson, or with borrowing the money of Brown & Co., and that they had no interest with him in any of those transactions.

Under these circumstances, the testimony was highly prejudicial. Undoubtedly the jury believed the initials "H. & B." meant Huntington & Barons, and "Q. M. & Co." meant Quinlin, Montgomery & Co.; at least they may have inferred so. It is probable that the maker of the memorandum in the book intended the initials to mean as interpreted above. Nevertheless, the book being inadmissible, the jury ought not to have been permitted to consider such entry or memorandum. For the error in admitting the book from the telegraph office and the memorandum therein for the consideration of the jury, the judgment in the case must be reversed.

With this conclusion, the other questions submitted are not important. They may not arise upon another trial.

The judgment of the district court will be reversed, and a new trial ordered.

All the Justices concurring.