## WALTER K. SHAW *v.* POSTAL TELEGRAPH & CABLE COMPANY.

1. CONTRACTS. *Foreign statute. Comity. Telegram. Cypher message.*

    The validity of a contract made in Massachusetts for the transmission and delivery of a cypher dispatch to an addressee in Tennessee is to be determined by the statutes of the state where made as construed by its supreme court, although such construction be in conflict with the principles of the common law. *Whitfield, C. J., dissenting.*

2. SAME. *Rules of telegraph company. Extra pay to insure accuracy.*

    Where, construing its own statutes, the supreme court of Massachusetts has held a regulation of a telegraph company requiring the payment of an additional sum to insure accuracy in the transmission of a dispatch reasonable and valid, the courts of this state will, in a suit on a contract there made, follow the Massachusetts decisions, although the contract would have been void if made in this state as exempting the company from liability for its negligence. *Whitfield, C. J., dissenting.*

FROM the circuit court of Marshall county.

HON. Z. M. STEPHENS, Judge.

Shaw, appellant, was plaintiff in court below; the Telegraph Company was defendant there. The facts are fully stated in the opinion of the court.

The case was first decided at the March term, 1900, but a reargument was granted, and the judgment of reversal then entered vacated, and the cause was continued. The opinion of the court, delivered by Woods, C. J., at the March term, 1900, the one recalled, to which reference is made in the dissenting opinion of Whitfield, C. J., was as follows:

"It is much to be regretted that the opinion of the court in this case, by reason of the necessity for its immediate preparation by its writer, must be confined to a general statement of the views which are held by us.

"By sec. 195 of our present constitution telegraph companies
are declared to be common carriers in their line of business,
and subject to liability as such.   On the case presented by the
record before us, we are of opinion that the stipulations of the
Telegraph Company limiting its liability in the transmission
of messages by it is in purpose and effect an attempt by the
company to limit its liability for negligence, and to guard
against the consequences of its negligence, and is, under our
law, and the public policy of this state, invalid.

"Regarding and treating this as an action for the wrong
done by the company to the appellant by its breach of its duty
to transmit his message correctly, and the substitution therefor
of another and a false one, and in view of the knowledge of the
company of the nature of appellant's business, and of its cus-
tom to receive and transmit his cipher messages in the trans-
action of his business, we are of opinion that the company is
liable to the full extent of the injury suffered by the appellant
for its breach of duty in the transmission of the cipher message.

"The authorities in harmony with, as well as those opposed
to our views, will be found carefully collected in the briefs of
the respective counsel.

"The action of the court below on the pleadings, as well as
its judgment finally, must be overruled and reversed.

*Reversed and remanded.*

*Tim E. Cooper,* for appellant.

The single question upon which a reargument has been
directed, is whether a certain stipulation printed on the back
of the telegraph blank on which the message was written is
and was a legal limitation of the liability of the company. The
provision of this limitation was, that the company should not be
liable for mistakes or delays in the transmission or delivery of
an unrepeated message, beyond the amount received for send-
ing the same.

Under the decisions of the supreme court of Massachusetts such limitation is held to be reasonable and legal, and it is admitted by the appellant that if suit had been brought in the courts of Massachusetts, no recovery could be had beyond the price paid for sending the message. The question upon which the court has invited reargument is whether the plaintiffs' right of action is controlled by the laws of Massachusetts, in which state the contract for the transmission of the message was made.

The following propositions are settled by the decision at the former term, and, as I understand, the court does not desire reargument as to these: (1) That the telegraph company is liable for the erroneous transmission of a cipher message; (2) that the damages sued for are such as may be recovered; (3) that at the common law the stipulation for exemption from liability by the telegraph company is unreasonable and invalid, because it is a stipulation to exempt the company from liability for its own negligence. Adhering to these propositions as decided, the inquiry of the court, as I understand it, is whether the law of Massachusetts recognizes the stipulation as valid and legal, and whether that law is to control because the contract was made in that state. The reply to the question thus propounded by the court is, that under the *law* of Massachusetts the stipulation for exemption is invalid and illegal, although under the *decisions* of the supreme court of that state it would be held to be reasonable and valid. In other words, my proposition is that the law of Massachusetts is one thing, the decisions of its supreme court is another; and that those decisions do not correctly decide what the law of that state is. The decisions of the supreme court of Massachusetts do not rest upon any statute. The only statute of that state having relation to telegraph companies is as follows: "Every company shall receive dispatches from and for other telegraph companies and associations, and from and for any persons, and on payment of the usual charges for transmit-

ting dispatches, according to the regulations of the company, shall transmit the same faithfully and impartially." This statute means such regulations of the company as are "reasonable and proper," as has been held by the courts of that state. *Ellis* v. *Telegraph Company,* 13 Allen, 235.

The supreme court of Massachusetts, in the cases cited by counsel for the appellee, has held, in accordance with the views expressed by some other courts, that a regulation by the telegraph company for exemption from injury resulting from ordinary negligence, is valid at the common law. It is not held that the *statute* makes valid such stipulation, but that they are valid at common law. The supreme court of Mississippi has uniformly held that no common carrier, and no corporation exercising callings or engaged in business from which arise duties to serve the public, can stipulate or contract for exemption from the consequences of its own negligence, whether the degree of negligence be what is called slight or gross. In this case this proposition remains so decided, and the court has not invited its reargument.

It is not true that the decision of a court makes the common law except as to those matters which are of *local* concern, and which become by a settled course of decision rules of property in the several states, or become rules of settled *local* policy. The supreme court of this state, and the supreme court of Massachusetts, in determining precisely the same question, have reached diametrically opposite conclusions on a matter determinable, not by Massachusetts statutes, but by the general commercial or common law of the country. The Massachusetts courts say that at common law a telegraph company may stipulate for exemption from liability for its own negligence. The supreme court of Mississippi holds that such stipulations are unreasonable and illegal.

The question is, whose judgment is to control, in a suit pending in this court, and to be by it decided? Both decisions cannot be right. If the Massachusetts court has rightly de-

cided, this court ought to follow such decision, not because it is the decision of the state in which the contract is made, but. because it is correct. But if this court has rightly decided, the Massachusetts court has wrongly decided, and the single question is whether the supreme court of this state shall follow an erroneous decision of the supreme court of another state, simply because the question arises in a case in which the contract which has been breached was there made. It is admitted by counsel for the appellee that if the federal court, sitting in the state of Massachusetts, entertained the view which this court holds, such federal court, if the plaintiff had sued therein, would have awarded a recovery, notwithstanding the fact that the Massachusetts courts would hold the stipulation for exemption valid.

If this concession correctly states the law, it would seem to end the controversy. But since the court cannot accept the admission of counsel as the law of the case, I shall attempt to show by authorities that the rule is correctly stated by me and conceded by counsel.

There are some matters as to which the decisions of state courts in a sense make the common law of their states, and as to which other courts, without regard to their own views, will accept such decisions as conclusive. Among such instances the following may be stated:

1. The extent and character of the powers which its various political and municipal organizations shall possess. *Claiborne Co.* v. *Brooks,* 111 U. S., 400.

2. The construction of its statutes and constitution as shown by a settled course of decision. *Leffingwell* v. *Warren,* 2 Black, 599; *Luther* v. *Borden,* 7 Hum., 1; *Post* v. *Supervisors,* 105 U. S., 667.

3. Those rules declared by the local tribunals which relate to rights and titles to things having a permanent locality, such as rights and titles to real estate and other matters immovable

and intraterritorial in their nature. *Swift* v. *Tyson,* 16 Peters, 1.

4. Rules governing the descent, transfer, or sale of property. *Bucher* v. *Cheshire R. R. Co.,* 125 U. S., 555.

5. Rules and law of evidence in actions at law. *Ex parte Fisk,* 113 U. S., 713; *Nitcor* v. *Hurt,* 13 Pet., 378; *Ryan* v. *Bindley,* 1 Wall., 66.

6. Local usages and customs having the form of laws. *Bonen* v. *Neivel,* 1 Z. N. Y., 290; *Bank* v. *Shaw,* 61 N. Y., 283.

7. Modifications of the common law made necessary by the situation and local conditions existing in the several states. *V. & J. R. R. Co.* v. *Patton,* 31 Miss., 156; *Green* v. *Weller,* 32 Miss., 650; *Crane* v. *French,* 38 Miss., 503.

Clearly the present controversy is not in reference to a matter *local in its nature,* within any of the tests just stated.

I shall now attempt to show by authority that the question involved is one of general law, which each court must decide for itself, and that the decisions of the Massachusetts courts are not of controlling authority. With due deference to opposing counsel, it is submitted that they have mistaken a conflict of decision for a conflict of laws. When this court speaks of common law it means the same body of laws to which the Massachusetts courts refer when they speak of the common law; and although the courts of the two states may, in their application of the general principles of this body of laws, reach opposing conclusions, this does not show a conflict of law, but a conflict of decision or opinion merely. If an action had been brought in the state of Massachusetts upon a contract determinable by the laws of France, and the courts of that state had decided what the law of France was, such decision would not be conclusive upon this court in another action brought for breach of another contract made in France. Each court would determine for itself what the law of France was, and the decision of the Massachusetts court would be valuable only as an aid to this court in considering the question. But whenever

this court should be satisfied that the decision of the Massachusetts court was erroneous, such decision would be disregarded. Wherever a contract is made in a common law state, and its breach is sued for in another common law state, nothing is gained by speaking of the *lex loci contractus* and of the *lex fori*, for they are precisely the same.

It is in the very nature of things impossible for a conflict of law to arise where the same system obtains in the two states. There may be a conflict of decision, but there cannot be a conflict of law. As I have heretofore stated, this court has held, and yet holds, that the stipulations for exemption printed on the back of the telegraph blank is invalid under the general law of the land; under that law which obtains both in Massachusetts and Mississippi. The supreme court of Massachusetts, on the other hand, have held that such an exemption is valid under that system of law common to both states. The decisions which are cited herein, are largely found in the cases before the supreme court of the United States, because they are more numerous in that court than elsewhere, and because the principles which apply are more fully and accurately stated in such decisions; but it is respectfully submitted that counsel for appellee are mistaken in characterizing the principle which these cases announce as a mere rule of the federal court. In all the cases cited in this brief, and in all the cases to be found in the decisions of the supreme court of the United States, the principle which controls is, that when questions are determinable not by local, but by general laws, each court, when called upon to decide, must determine for itself what that law is, and must determine for itself to what state of facts it should be applied. The decision of the Massachusetts court is not more conclusive upon a common law question decided by it where the right of action arose in Massachusetts, than it would be if the right of action came into existence in another common law state. In either event that court would be speaking of the same general system of laws—what is known as the common law, and which when not

modified by statute or by local usages, is the same in all the common law states.

The following authorities clearly support our contention: *Swift* v. *Tyson,* 16 Peters (U. S.), 1; *Railroad Co.* v. *Prentice,* 147 U. S., 101; *Liverpool, etc., Co.* v. *Phoenix, etc., Co.,* 129 U. S., 397; *Railroad Co.* v. *Lockwood,* 17 Wallace (U. S.), 357; *Myrick* v. *Railroad Co.,* 107 U. S., 102; *Illinois, etc., R. R. Co.* v. *Frankenburg,* 54 Ill., 88; *Illinois, etc., R. R. Co.* v. *Johnson,* 34 Ill., 389; *Chicago* v. *Robbins,* 2 Black (U. S.), 418; *Railroad Co.* v. *Bank,* 102 U. S., 14; *Hough* v. *Railroad Co.,* 100 U. S., 217; *Nutting* v. *Railroad Co.,* 1 Gray (Mass.), 502; *Borroughs* v. *Railroad Co.,* 100 Mass., 26; *Railroad Co.* v. *Baugh,* 149 U. S., 369.

*J. R. McIntosh* and *Frank Johnston,* for appellee.

There is no doctrine of law better settled, or more universally and firmly established, than that the validity and construction of a personal contract is governed by the place where it is made, and if valid by the *lex loci contractus,* that it is valid everywhere. Story's Conflict of Laws, sec. 242.

Chancellor Kent states the doctrine to be, that a contract valid by the *lex loci contractus* is valid everywhere, and that "it is founded on necessity and commercial convenience." 2 Kent's Commentaries, 454, 458.

And the doctrine is so stated by Wharton in his work on the Conflict of Laws, secs. 401, 409.

In the case of *Ivey* v. *Lalland,* 42 Miss., 444, involving the question of the validity of a promissory note made in Louisiana, during the civil war, the consideration of which was Confederate money, the court thus stated the rule on this subject:

"The general principle as to the validity of a contract is, that a contract which is valid where it is made, is to be held valid everywhere. And, on the other hand, if void or illegal by the law of the place where made, it is void everywhere. The general rule as to the construction of contracts is, that if

they relate to movables which have no *situs* or place, they are to be construed according to the place where they are made, or the *lex loci contractus;* and if they relate to immovables, or what the common law terms real property, they are to be construed according to the laws of the place where the property is situated, or the *lex loci rei sitae.* But in respect to all questions as to the forms, or methods, or conduct of process or remedy, the law of the place of the forum applies, or the *lex fori* governs."

The court decided the case according to the *decisions* of the supreme court of Louisiana.

This doctrine was announced by this court in the case of *Brown* v. *Freeland,* 34 Miss., 181. The note sued on in that case was made in Mississippi, and was payable in New York, and, according to the law of New York, was usurious. The question was whether it was governed by Mississippi law or the laws of New York. The court said in its opinion: "The *lex loci contractus* controls the nature, construction, and validity of the contract, and if valid by that law, it is equally so everywhere." The court then noted the qualification to the rule, that where the contract is made in one country, but to be performed in another, it may be presumed that the parties contracted with reference to the laws of the latter country. But the court said on this point: "This, however, being but presumption, must be controlled by the actual truth of the case when ascertained, or, in other words, by the intention of the parties, to be collected from the contract itself and the surrounding circumstances."

In the case of *Carroll* v. *Renich,* 7 Smed. & M., 798, the question was in respect to the construction of an antenuptial contract made in Tennessee, and involving personal property. The question, arising upon the contract, was whether the instrument came within the rule in Shelley's case. According to the decisions of the supreme court of Tennessee, the first taker under the instrument took a fee simple under that

rule. The supreme court of this state entertained the opinion that if the contract was governed by Mississippi law, the first taker would not have taken a fee, but a life estate, with the remainder limited over in fee. The court applied the law of Tennessee to the contract, but in doing so, Mr. Justice Clayton delivering the opinion, said: "We wish it distinctly understood that this opinion is given solely with reference to the laws of Tennessee. It is a case of first impression in this State, and we wish no misapprehension of our views on this point."

The case of *Bank of Louisiana* v. *Williams et. ux.,* 46 Miss., 618, involved the question as to what extent a promissory note made in Louisiana in the year 1857, by a married woman who was domiciled in Mississippi, was binding upon her personally, or upon her separate estate here. The note was secured by a mortgage on property in Louisiana. By the Mississippi law, if the contract had been made here, she would not have been bound personally by the note. The legislative charter of the Bank of Louisiana allowed married women, their husbands joining with them, to mortgage their property to secure debts due to the bank. The question in the case was whether the contract was governed by the *lex loci contractus,* or the *lex domicilii.*

The court decided that the contract was governed by the *lex loci contractus,* and, upon a construction of the Louisiana statute, held the contract to be valid, but that it was limited in its operation to the estate of Mrs. Williams in that state, and not binding upon her separate estate in Mississippi. Mr. Justice Simrall, delivering the opinion of the court, said, on the doctrine of the *lex loci contractus*: "It will thus be perceived that this is one of those embarrassing questions arising out of the conflict of laws so perplexing to the courts. The general rule is, that the *lex loci contractus* governs as to validity and construction, unless, indeed, some other state or country is appointed by the parties as the place of performance, and the contract is made with special reference to its law."

In *Lawrence* v. *Pullman Car Co.,* 74 Miss., 782, the question

of liability, as well as the question of the measure of damages, was decided according to the decisions of the State of Illinois, where the tort occurred. Both were common law questions, not arising under any statute. It is thus seen that this doctrine is firmly settled as the law of this state by the decisions cited, as well as by several other cases where the rule is also expressly recognized by this court.

The authorities in other states are to the same effect. *Turnpike Co.* v. *Warren,* 6 N. H., 150; *Stix* v. *Matthews,* 75 Mo., 96; *King* v. *Knepper,* 22 Mo., 550; *Smith* v. *McLean,* 21 Iowa, 329; *Arnold* v. *Potter,* 22 Iowa, 198; *Davis* v. *Bronson,* 6 Iowa, 424; *Savary* v. *Savary,* 3 Iowa, 272; *Mead* v. *Smith,* 3 Conn., 253; *Bank* v. *Donally,* 8 Peters (U. S.), 372; *Pearsall* v. *Dwight,* 2 Mass., 84; *Scudder* v. *Bank,* 91 U. S., 406; Story's Conflict or Laws (2d ed.), sec. 37.

Contracts limiting the liability of common carriers and telegraph companies do not constitute any exception to the rule, but are governed by the doctrine that the validity and construction of contracts are to be determined by the *lex loci contractus.*

There is a uniform current of decisions on this subject, in which the doctrine of the *lex loci contractus* is applied to this class of contracts. A number of leading and well-considered cases on the precise point now under consideration are cited for the consideration of the court. *Cantur* v. *Bennett,* 39 Tex., 303; *Robinson* v. *Transportation Co.,* 45 Iowa, 470; *Railroad Co.* v. *Boyd,* 91 Ill., 268; *Hale* v. *Navigation Co.,* 15 Conn., 539; *Pennsylvania Co.* v. *Fairchilds,* 69 Ill., 260; *Railroad Co.* v. *Smith,* 74 Ill., 320; *Hazel* v. *Railroad Co.,* 82 Iowa, 477; *Talbott* v. *Transportation Co.,* 41 Iowa, 247; *Forepaugh* v. *Railroad Co.,* 128 Pa. St., 217; *Fairchilds* v. *Railroad Co.,* 148 Pa. St., 527; *Railroad Co.* v. *Exposition, etc., Mills,* 81 Ga., 522; *Palmer* v. *Railroad Co.,* 101 Cal., 187; *Fonseea* v. *Steamship Co.,* 153 Mass., 130; *Reed* v. *Telegraph Co.,* 135 Mo., 661.

CALHOON, J., delivered the opinion of the court.

Appellee had a telegraph office in Boston, Mass. Appellant contracted with it in that city to send a cipher dispatch to Memphis, Tenn., in these words: "Haycock, to-day. Impetus, aggress, balcony ceremony, charter, charioteer, leaven, thirty, daisy." On the back of this message was a printed stipulation that the company should not be liable for mistakes in transmission of obscure or cipher messages unless the sender insured it, as he might do, by paying a trifling sum in excess of the usual charge. This message, as delivered in Memphis, Tenn., was as above, except that the middle letter "r" in the word "charter" was changed to the letter "t," so as to make the word "charter" read "chatter." This word "chatter" was also a cipher character in complainant's telegraphic code, but it had a very different meaning from the word "charter." The message contracted to be sent, when translated, would read thus: "We do not see any chance of selling the cotton you have offered to-day. The best offer we can obtain is 5 7-8 cents, 300 average strict middling, nothing below middling; good, strong staple, nothing below 1 1-16 inches long; cotton to be shipped within thirty days. Dwight Mfg. Co., Chicopee, Mass." The message actually delivered in Memphis, when translated, read thus: "We do not see any chance of selling the cotton you have offered to-day. The best offer we can obtain is 5 7-8 cents, 300 average strict middling, nothing below middling; some sand and dusty staple, nothing below 1 1-16 inches long; cotton to be shipped within thirty days. Dwight Mfg. Co., Chicopee, Mass." The word "charter" meant "good, strong staple," while the word "chatter" meant "sand and dusty." The difference between the letter "r" and the letter "t" in the message cost the sender about $1,000. The mistake by the transmitting operators seems quite infinitesimal, but the result was grave; and this, to the average mind, emphasizes the curious carelessness in the telegraphic codifier in using such similar words with such opposite meanings. Ap-

pellant brought his action at law in tort for his damages—
$1,054.18.

Whether the action be *ex contractu,* or *ex delicto,* arising out
of the contract, it must be controlled by the *lex loci* of the con-
tract. [This is finally conceded.] It is also conceded that in the
courts of Massachusetts appellant would be denied the right
of recovery. It is also plain, and conceded, that the constitu-
tion and laws of the state of Mississippi, have nothing whatever
to do with the case, but that it must be determined by the
laws of the state of Massachusetts. On behalf of the appellant,
however, it is contended that the law prevailing in the state
of Massachusetts was the general common law, which the courts
of each state must determine for themselves, regardless of the
adjudication of what the common law is by the courts of the
state of the contract. But it is admitted, as it must be from
the uniform and universal rulings of all courts, that, regardless
of the residence of the parties, where there is a statute, the
construction and interpretation of the statute by the court of
the state of the statute is binding on the courts everywhere.
It is, of course, not tolerable to avoid this universal rule by a
mere change of the form of action from one on the contract to
one in tort for non-performance of the contract. If com-
plainant could not sue in Massachusetts because of its statute,
he cannot sue anywhere. A statute of Massachusetts, existing
at the time of the contract, referring to the telegraph com-
panies, is in these words: "Every company shall receive dis-
patches from and for other telegraph lines, companies, and
associations; and, on payment of the usual charges for trans-
mitting dispatches according to the regulations of the company,
shall transmit the same faithfully and impartially." Gen.
St., 1860, p. 373, sec. 10. This statute was considered by the
supreme court of Massachusetts in 1866 in the case of *Ellis*
v. *Telegraph Co.,* 13 Allen, 226. That court, consisting of six
judges, speaking through Chief Justice Bigelow, after discuss-
ing the common law, said: "But we need not have recourse to

these familiar and well-settled principles of the common law, in order to establish the right of the owners and conductors of the telegraph companies to make rules and regulations by which to define and limit their duties and obligations in the transaction of the business which they assume to carry on. This right is clearly recognized and affirmed by the statute already cited." Page 235. The court then proceeds to hold that the "regulation" must be reasonable according to the "true interpretation of the statute" (page 235), and then holds that the requirements of increased tariff to insure accuracy is reasonable, about which the court says: "Upon this point we can entertain no doubt." The same court, differently constituted in its personnel as to several of its members, composed of seven members, speaking through Chief Justice Gray, recited the same statute, and arrived at the same conclusion. This was in 1873. *Grinnell* v. *Telegraph Co.,* 113 Mass., 299 (18 Am. Rep., 485). Appellant tries to escape from these decisions by urging upon us that the scope and extent of the statute is a common-law question, not to be finally settled by the courts of the state of the statute. This cannot be. Courts may construe and interpret the scope and extent of their local statutes, and say what they embrace, or do not embrace, and their conclusion must be authoritative in every other state. It is not possible to interpret a statute without interpreting its scope. What a statute embraces, or does not embrace, is necessarily in every construction of it. At least, the writer cannot now recall or imagine a case where there could be any need of construction or interpretation except only to determine what it includes or excludes, what it comprehends or does not comprehend—in other words, its scope and effect. Now it is conceded that the Massachusetts court holds that the statute of that state does include the matter in controversy, and this ends the case. The position that because sec. 195 of our constitution makes telegraph companies common carriers, and our courts have held that they cannot contract against their own negligence, enables

us to invalidate a valid or make valid an invalid Massachusetts
contract, is unsupported by any decision in the whole world.
If so, Massachusetts could validate and invalidate Mississippi
contracts.     There is no penalty in either state.     One simply
makes the contract valid, the other invalid, and the whole ques-
tion is, in which state was it entered into ?     There is no statute
in either state declaring that its courts shall not enforce, or shall
enforce, valid or invalid contracts under the statutes of the
other, as was the case in *Lemonius* v. *Mayer,* 71 Miss., 514 (14
So. Rep., 33).     One state cannot be made the dumping ground
for lawsuits between citizens of another State when they cannot
recover from each other in their own state, where they made the
contract, because of their own statute as construed by their
own court.     It is idle to attempt to assimilate this case to the
case of general transitory actions allowable in the home courts.
Our own court has repeatedly held that actions in tort, as well
as in contract, are governed by the law of the place of the
injury.     *Railroad Co.* v. *Wallace,* 50 Miss., 244; *Car Co.* v.
*Lawrence,* 74 Miss., 782 (22 So. Rep., 53) ; *Martin* v. *Rail-
road Co.* (Miss.), 27 So. Rep., 646; *Railroad Co.* v. *Crudup,*
63 Miss., 291; *Railroad Co.* v. *Doyle,* 60 Miss., 977.     And in
some of these cases there were no statutes, and the decisions are
looked to in order to ascertain the law of the state of the injury.
But it is unnecessary to decide upon the question of the con-
trolling law where there is no statute.     The real complaint here
is the non-execution of a Massachusetts contract, and the fact
that the defendant's damaging mistake was made by its op-
erative in Georgia in repeating the message can make no differ-
ence.     The contract of transmission was entire; and solemn
contract rights cannot be destroyed by a mere trick of pleading
in denominating them torts, even if this changed the case.     It
is clear that we must look to the judicial decisions in a state to
ascertain the law in all cases where they construe their own
statutes.     All statutes, without a solitary exception, existent or
conceivable, must be interpreted by the rules of the common

law.   But the decisions of the courts of the state of the statute, right or wrong, must be final.   It is for them to say what is the true construction and scope of their own statute by their view of the common law, or by their own reasoning, sound or unsound.   In *Block* v. *McMurry,* 56 Miss., 217 (31 Am. Rep., 357), our own court held a Sunday contract made here void because of our laws.   But in *McKee* v. *Jones,* 67 Miss., 405 (7 So. Rep., 348), it held that a defendant sued in this state on a Louisiana Sunday contract, was bound because that state had no law against a Sunday contract.   Even public policy must yield to the law of the state of the contract, unless where the statutes of the forum forbid enforcement in its courts, or the matter is *malum in se.*   An action in tort for damages for breach of a contract made in one state, by citizens of that state, which cannot be maintained, either in that state or in the state of performance, because of the ruling of the courts of those states, cannot be maintained anywhere.   It seems right to charge the whole world with notice of the statute law of the place of the contract, but to charge citizens only with notice of the rulings of their court on the binding force of such a contract in commercial dealings.   The powers given appellee, by the Massachusetts statute, to impose "reasonable regulations," as construed by her court of last resort, surely must govern all courts of all other states and nations.   There has not been, and, it is probable, never can be, produced a case where two citizens of the same state contract in that state, and the courts of that state deny the right of action because of their construction of the powers allowable in the scope of their own state statute, that one of the parties, without relief in that state, may step across the border and find relief.   That is the effort here, and it ought to fail.   It is a misconception of a great and universal principle to hold that, because the Massachusetts court may have erred in its view of the common law in holding what was a "reasonable regulation" in the scope of the Massachusetts statute, therefore it did not bind all other courts.   It is the

conclusion arrived at, not the reasoning, which binds.          The former judgment is vacated, and the decision below is

*Affirmed.*

WHITFIELD, C. J., delivered the following dissenting opinion:

The sole question on this reargument relied on by appellee is that this is an action *ex contractu,* and that the contract was made in Massachusetts, and that the doctrine that a contract valid by the statute law of the state where made is valid everywhere, governs. It is obvious, therefore, that if it be that the statute of Massachusetts does not determine the case, then the argument wholly fails. The question for decision is, whether a regulation by a telegraph company, that there shall be no liability, beyond the amount paid, in the case of an unrepeated message, is not an attempt to stipulate against the consequences of the company's own negligence. What is the Massachusetts statute? It is a general act entitled "Of Telegraph Companies," and is ch. 64 of the general statutes of Massachusetts passed in 1860. The telegraph as an agency of communication had just come into vogue. The supreme court of Massachusetts, in *Ellis* v. *Telegraph Co.,* 13 Allen, 230, decided in October, 1866, calls it "this novel branch of human skill." And the act of 1860 was passed to define in a merely general way what telegraph companies might do. For example, it provides (sec. 2) that they might construct lines along public highways, over waterways, etc., by erection of posts, piers, etc.; in sec. 3, that the mayor and aldermen of any places through which it might pass should specify where the posts should be erected, the kind and height of posts, etc.; in sec. 4, that damages may be awarded in the exercise of the right of eminent domain, etc., and how in detail; and other provisions fixed the capital to be subscribed, the limit of debt such companies might contract, not exceeding one-half of its capital stock actually paid in (a limitation that would startle these companies in this day); the liability of its officers, etc.—

all provisions of the most general character, obviously due to the fact that the legislature of that state was then dealing with these companies for the first time. By sec. 10 it was provided: "Every company shall receive dispatches from and for other telegraph lines, companies, and associations, and from and for any person; and on payment of the usual charges for transmitting dispatches, according to the regulations of the company, shall transmit the same faithfully and impartially." It is perfectly plain that this section does nothing at all except merely to authorize the telegraph company to "make rules and regulations." Nor does it declare, in any way whatever, how it shall be determined whether such a rule of the company is reasonable or unreasonable. It is a mere naked power granted to the company to make rules. It is too plain for argument that those rules must be reasonable. The particular question involved here is simply and only this: How did the supreme court of Massachusetts determine that the rule was reasonable? Did it find any guide or standard of reasonableness in the statute? Manifestly not. By what standard or test, then, did it decide the question whether it was a reasonable rule? Most manifestly by a resort to the general principles of the common law. That these rules must be reasonable, see what the court itself said at p. 235: "But we need not have recourse to these familiar and well-settled principles of the common law in order to establish the right of the owners and conductors of telegraphs to make rules and regulations by which to define and limit their duties and obligations in the transaction of the business which they assume to carry on. This right is clearly recognized and affirmed by the statute already cited. By that corporations, associations, and individual owners of lines of telegraph doing business within this commonwealth are only required to transmit dispatches 'according to the regulations' which they may establish. It is hardly necessary to say that this provision does not confer the right to impose such conditions or restrictions in the mode of conducting the business as the self-

interest or caprice of owners and conductors of telegraphs may dictate, but only those which are reasonable and proper in view of the nature of the business, and the risks and responsibilities which ·it involves, and the necessity of securing to the public due opportunities for a fair and reasonable use of the telegraph, as well as of affording due protection to the rights of those on whom are imposed the duty and burden of conducting the business for public accommodation. This is the true interpretation of the statute. Any other construction would lead to the result that the legislature conferred a power to establish unreasonable regulations for the conduct of a business of a quasi public nature—a conclusion which is manifestly absurd." This quota· tion plainly shows that the court held that the company, and not the statute, made the rule, and that it was for the court to determine as a judicial question whether that rule was reasonable. Another observation is proper here, and that is this: That the language of the court we quote as to the right of owners of telegraph companies to make rules shows, and only shows, that the thing for which there was no need to resort to the common law was merely the right of the owners of telegraph companies "to make rules." The court had been reasoning at p. 230 as to the right of "this novel branch of industry" to make rules for the regulation of its business in the abstract, and it had reached the conclusion that under the common law such company had the right to make rules and regulations. It then shows, in the passage quoted, that, if the common law had been silent, the statute specially conferred such mere general right to make· rules and regulations. That is absolutely all that the court said the statute had done, and a mere inspection of the face of the statute shows that this is precisely all that the statute did, to wit, confer upon telegraph companies the mere general power to make rules and regulations. Nowhere in the opinion of the court is it either expressly said, or in the most remote way intimated, that the statute itself had either made any regulation or furnished any test by which to determine the reason-

ableness of the regulations made by each company. Whether
this regulation is reasonable, and by what standard it was to be
determined whether it was reasonable, was the exact proposition
involved in *Ellis* v. *Telegraph Co.* And now the crucial point
in the reasoning is reached. What standard did the supreme
court test the reasonableness of the rule by? By the statute?
Plainly not, for the statute furnishes none. It is most manifest-
ly by the general principle of the common law, and it is only
necessary to read carefully the opinion of the court, pp. 231.-
238, inclusive, to see that they did decide the rule to be rea-
sonable by a resort to the principles of the common law, and to
them alone. They refer, for example, to the peculiar nature of
the business of transmitting messages by electricity; to the fact
that there can be no manual possession of the message, as in the
case of property ordinarily shipped by common carriers; that
the message is wholly under the control and supervision of its
owner while in its custody; to atmospheric disturbances and dis-
arrangement of electrical apparatus, and the imperfections in-
cident to the transmitting of sounds by electricity. From these
and from like considerations they determined that the rule was
reasonable that a telegraph company was not a common carrier
according to the principles of the common law, and could not
be held as an absolute insurer, and that this sort of stipulation,
though a stipulation against negligence, was a reasonable stipu-
lation, because of the differences existing between a telegraph
company and a usual common carrier from the nature of their
business. These are the reasons and principles by which the
Massachusetts supreme court decided the reasonableness of this
rule—the principles of the general common law—and by them
alone. So, in *Grinnell* v. *Telegraph Co.,* 113 Mass., 299 (18
Am. Rep., 485), the court again resorted not to the statute, but
to the general principles of the common law, to determine
whether this rule was reasonable. Now, the question recurs,
is the supreme court of this state bound by this decision of
the Massachusetts supreme court holding this rule to be rea-

79 Miss.—44

sonable, when the statute did not prescribe the rule, did not furnish any test as to the reasonableness of the rule; when the only construction of the statute indulged in by the court was simply that it had conferred upon the company the mere general right to make rules; when it expressly held that the reasonableness of that rule was a question of judicial determination; and when it did determine that the rule was reasonable, by a resort to the principles of the common law, as the only test it could apply? Or, to state the question simply and sharply, is the supreme court of Mississippi bound, as to what the principles of the common law are, by the view of the supreme court of Massachusetts as to what those principles are? Is it not for the supreme court of each state to determine for itself what the common law is? And when some rule adopted by a telegraph company is to be held reasonable or unreasonable, according to the principles of the general common law, does not the supreme court of each state declare that rule reasonable or unreasonable, according to its own view of the principles of the common law applied to that rule? It would seem that to state the question is to answer it. That exactly, that precisely, neither more nor less than that, is the question involved in this case, treating the action as *ex contractu*. It would put this state in a most extraordinary attitude if it had to follow the interpretations of the principles of the common law as announced by the courts of forty-four other states. On the very same state of facts as to whether a rule of the telegraph company was reasonable, we would have to hold one way in cases arising in those states holding it unreasonable, and another way in cases arising in states holding it was held reasonable. Endless confusion would be the inevitable result of any such abdication of judicial power on the part of this court. Of course, if a contract made in another state is made by virtue of a statute of that state, the statute making such a contract valid, and the supreme court of that state construing it as valid under that

statute, the courts of every other state whose positive law or public policy is not violated by that statute will treat such contract as valid. That is an elementary principle thoroughly recognized everywhere. But that is not this case. This statute did not prescribe this rule. It did not say that a telegraph company might provide against liability in case of unrepeated messages; it did not furnish any test by which to decide upon the reasonableness of such rule; it simply said the company might make rules, leaving the court to determine—as it did determine—the reasonableness of the rules by the well-settled principles of the common law. It is also to be carefully borne in mind that this court has decided by necessary implication in two cases, to wit: Allen's case, 66 Miss., 549 (6 So. Rep., 461); Alexander's case, 66 Miss., 161 (5 So. Rep., 397); 3 L. R. A., 71; 14 Am. St. Rep., 556, and directly in this case in the former opinion, that it is not competent for the telegraph company to adopt this rule, since it is nothing else than an effort to contract against the consequences of its own negligence. And since these decisions the constitution of this state has expressly declared (sec. 195) telegraph companies are common carriers, and hence liable as such; and further, that the decided weight of authority, and undoubtedly the better-reasoned cases, hold such a rule void, as unreasonable. Reference is made to this to show this, simply: That this stipulation, being one clearly violative of our public policy on this subject, as manifested both by judicial decisions and constitutional declaration, ought never to be upheld by this court, except in the single case of a contract made valid by the terms of a statute, which statute has been approved by the supreme court of the state. Such was the recent case of *Kendrick* v. *Kyle,* 78 Miss., 278 (28 So. Rep., 951). There the question involved was whether a certain rate of interest was usurious or not. That rate the different statutes expressly dealt with, and the supreme court of Tennessee held the particular statute involved valid as to the rate, the statute itself declaring the rate; and no public policy of this state was violated

by the Tennessee statute or decision. That case would be analogous to this if this statute prescribed the rule, and the supreme court of Massachusetts had held the rule valid because the statute had prescribed it, holding, also, the statute to be valid. The cases differ *toto coelo.* The exception that no state supreme court will enforce a contract violative of its statute law or its public policy is as thoroughly settled as the rule to which it is the exception, and it is essential to the proper exercise of judicial power by each supreme court. It is unnecessary to cite authorities. The doctrine is put with great clearness in the learned note to *Gist* v. *Telegraph Co.* (S. C.), 55 Am. St. Rep., 774, 775 (S. C. 23, S. E. 143), where it is said: "But the rule is subject to the exception that no nation or state is bound to recognize or enforce contracts made elsewhere which are injurious to its own citizens or subjects. The enforcement by one nation or state of contracts made under the laws of another rests on a principle of comity, which cannot be so far extended as to violate the public policy or positive legislation of the former."

The suggestion has been made (not in the argument of counsel for appellee) that, because neither of the parties live in this state—because no part of the telegraph line over which this message was transmitted traversed this state—therefore, this court ought not to entertain this action. The complete answer, however, to this objection is, that this is a purely transitory action, and, if the defendant was found here, it ought to answer, just as any other defendant in a transitory action found here ought to answer. We have nothing to do with the good taste of the proceeding. It is simply our duty to administer right between the parties according to our view of the principles of the common law.

One final observation: The case of *Forepaugh* v. *Railroad Co.,* 128 Pa., 225; 18 Atl., 503; 5 L. R. A., 508; 15 Am. St. Rep., 672, announces a proposition contended for very earnestly by one of the learned counsel for appellee, to wit, that there is no

such thing as a general common law—that is to say, a body of law known as the "common law"—and that each state has its own peculiar common law, and that hence its construction of the reasonableness of the rule, according to what is thus curiously called "its special and peculiar common law," is binding upon all other states. This doctrine is utterly unsound. The correct view is stated in *St. Nicholas Bank* v. *State Nat. Bank* (N. Y.), 27 N. E., 851 (13 L. R. A., 243, 244), where the court say: "The defendant, however, claims that the contract with the plaintiff is to be treated as a Tennessee contract, and that by the law of that state it cannot be made liable for this loss. Upon the trial, for the purpose of showing the law of that state, it put in evidence a decision of the supreme court in the case of *Bank of Louisville* v. *First Nat. Bank of Knoxville*, 8 Baxt., 101 (35 Am. Rep., 691). In that case a bill of exchange, payable at the First National Bank of Knoxville, was sent by a New York bank to the Bank of Louisville for collection. It was transmitted by the Louisville bank to the Knoxville bank, was received by the latter, and was subsequently returned unpaid. The cashier of the Knoxville bank delivered the bill to a notary public, in good repute at the time, who failed to protest it, by reason of which the right of action against the drawer was lost. The Louisville bank paid the amount of the bill to the New York bank, and then brought suit to recover against the Knoxville bank, and failed. It was held that 'where a bank receives a bill of exchange for collection, payable at a distant place, its liability is discharged by transmitting the same in due time to a suitable and responsible bank or other agent at the same place of payment; and in such case the principal's assent to the employment of a sub-agent is implied,' and that, 'if a debt be lost by negligence of an agent to whom a bill of exchange is sent for collection, the principal or home bank (having complied with its duty, and not being liable to the holders) cannot, by voluntarily discharging the claim of the payee, maintain an action on the case, for negligence, against the sub-

agent. Such right accrues only to the holder or payee of the
bill, under the circumstances.' That decision was not based
upon any statute law, but upon the principles of the common
law, supposed to be applicable to the facts of the case. It did
not make or establish law, but expounded the law, and furnished
some evidence of what the law applicable to that case was—
evidence which other courts might or might not take and receive
as reliable and sufficient; and even the same court, upon fuller
discussion and more mature consideration, might in some sub·
sequent case refuse to take the same view of the law. There
is no common law peculiar to Tennessee. But the common law
there is the same as that which prevails here and elsewhere,
and the judicial expositions of the common law there do not
bind the courts here. The courts of this state, and of other
states, and of the United States, would follow the courts of
that state in the constructions of its statute law. But the courts
of this state will follow its own precedents in the expounding
of the general common law applicable to commercial transac-
tions, and so it has repeatedly held. *Faulkner* v. *Hart,* 82 N.
Y., 413 (37 Am. St. Rep., 574) ; *Swift* v. *Tyson,* 16 Pet., 1 (10
L. Ed., 865) ; *Oates* v. *Bank,* 100 U. S., 239 (25 L. Ed., 580) ;
*Ray* v. *Gas Co.,* 138 Pa., 576; 20 Atl., 1065; 12 L. R. A.,
290; 21 Am. St .Rep., 922 (decided in Pennsylvania su-
preme court, January 12, 1891). We must, therefore, hold
that the obligation resting upon the defendant was that which
the principles of the common law, as expressed by the courts
of this state, placed upon it." And in 6 Am. & Eng. Enc. Law,
p. 283, where the editors say, "Yet, when the decision turns
upon the construction of the common law in such sister state,
the court will follow its own precedents in expounding the gen-
eral rules of the common law applicable to such transactions."
There is a general body of law known as the "common law,"
and each state supreme court is not only authorized, but is re-
quired, to determine what those principles are, in the appli-
cation of any rule for itself, and is wholly unaffected by the

view taken in that regard by any other state supreme court. This is as thoroughly settled as any doctrine can be—as thoroughly settled as the complementary doctrine that the decision of a state court construing a state statute, and holding a contract made under the provisions of that statute valid, is binding upon every other state supreme court whose public policy and whose statute are not thereby violated. So far as a cipher message is concerned, the case of *Shingleur* v. *Telegraph Co.,* 72 Miss., 1030 (18 So. Rep., 425); 30 L. R. A., 444; 48 Am. St. Rep., 604, settles the proposition that the company is liable in case of failure to transmit correctly a cipher message. It would have been an idle performance for the court in that case to have indulged in the reasoning which it did, and to have rested the case upon the ground it did, if the court had thought the telegraph company not liable because the message was a cipher one. The reasoning in the Rose Case, 3 Abb. Prac. (N. S.), 408, is wholly unsatisfactory, and is opposed both by reason and the best-considered authorities. In this case, aside from the general principle, it was clearly proved that this telegraph company had been for several years engaged in the business of sending cipher messages for this appellant in its business, inviting this appellant to send these cipher messages about this cotton business, and knew fully the importance of the message so sent.

Independently of this view, it is also clear that the appellant can recover not only in contract, but in tort. See *Shingleur* v. *Telegraph Co.,* 72 Miss., 1030 (18 So. Rep., 425); 30 L. R. A., 444; 48 Am. St. Rep., 604. The negligence occurred in Georgia. The breach occurred in Tennessee, by reason of the mistake made in Georgia. The message delivered was not the message appellant sent, but an altered message—altered by the mistake of the company's office in Georgia. There is not only a breach of contract in the case, but a distinct tort—this alteration of the message and its delivery as altered. It is well observed by counsel that the failure to deliver the message at all would not

have caused the injury. The loss which here results from the tort is of a different character. If the message had been to buy wool at a stated price—say, 20 cents a pound—and the message had been altered, and delivered as altered, directing the purchase of cotton at the same price, it would be clear that the loss resulted from the tort, not from the breach of contract. The defendant cannot say that the plaintiff cannot recover for the tort, because there was a contract. Both rights may co-exist, and arise from the same facts. See the authorities in *Shingleur* v. *Telegraph Co.,* 72 Miss., 1030 (18 So. Rep., 425); 30 L. R. A., 444; 48 Am. St. Rep., 604. The former opinion of this court, delivered by Chief Justice Woods, rests the liability as well on the view that a tort was committed as that there was a breach of the contract. It also distinctly holds that the telegraph company is liable in case of a cipher message, and cannot make a valid rule exempting itself from liability in case of an unrepeated message. These views are reaffirmed. I refer to the following authorities: *Gillis* v. *Telegraph Co.,* 61 Vt., 461; 17 Atl., 736; 4 L. R. A., 611; 15 Am. St. Rep., 917; *Pepper* v. *Telegraph Co.,* 87 Tenn., 554; 11 S. W., 783; 4 L. R. A., 660; 10 Am. St. Rep., 699; *Telegraph Co.* v. *Short,* 53 Ark., 434; 14 S. W., 649; 9 L. R. A., 744; *Brown* v. *Telegraph Co.,* 111 N. C., 187; 16 S. E., 179; 17 L. R. A., 648; 32 Am. St. Rep., 793; *Wertz* v. *Telegraph Co.,* 7 Utah, 446; 27 Pac., 172; 13 L. R. A., 510; *Telegraph Co.* v. *Eubanks* (Ky.), 38 S. W., 1068; 36 L. R. A., 711; 66 Am. St. Rep., 361. It is distinctly stated in the note to Brown's case, 17 L. R. A., 648, that the doctrine announced therein—the opposite doctrine to that in the Rose case—is in accordance with the most modern cases on the subject. The conclusion reached by the court, as announced by Chief Justice Woods, is sound, in my judgment. The members of the court all agree—treating the case as *ex contractu*—in the correctness of that opinion, in all respects, except as to the single proposition that the stipulation against liability for an unrepeated message is determined

by the terms of the Massachusetts statute. My brethren think that statute covers it. I do not think the statute touches it, but that its reasonableness was determined by the Massachusetts supreme court on the general principles of the common law, and that their judgment manifestly would have been the same if no statute had existed. There is no difference as to the proposition that there is no common law peculiar to Massachusetts, or to any state, and that this state supreme court should interpret the principles of the common law in accordance with its own precedents, and is not bound by the decision of any other state supreme court holding a contract valid, which contract depends upon the construction of the common law, and not upon the statute of another state. I fail to see how the fact that the parties live in Massachusetts affects the question at issue. There is but one question for solution: Did the Massachusetts statute prescribe this rule, or the test by which its reasonableness was to be determined? It is plain that the statute did neither. How, then, can this be said to be a case governed by that statute? The Massachusetts supreme court held the rule reasonable, not because it found the rule in the statute, not because it found any standard prescribed by the statute for determining whether the rule was reasonable, but because it thought it a reasonable rule by the principles of the common law. Cases holding that this court is bound by the construction of a contract by the supreme court of a sister state, as being valid, because the statute—the statute itself—makes the contract valid, have no application here.

"I regret the necessity of differing from my brethren, and nothing but strong conviction that their view is erroneous could constrain me to do so. I greatly fear the precedent established will return to plague us."