· (Jan. 15, 1910.)

ELISHA STRONG et al., Appellants, v. WESTERN UNION TELEGRAPH CO., Respondent.

[109 Pac. 910.]

TELEGRAPH COMPANIES — NEGLIGENCE — RULES AND REGULATIONS — LIABILITY — PUBLIC POLICY — VOID STIPULATIONS — EVIDENCE — ALLEGATION OF NEGLIGENCE—PRIMA FACIE CASE—DEFENSE—NONSUIT—CONTRACT.

(Syllabus by the court.)

1. A telegraph company is chartered for public purposes, has the power of eminent domain, is a public agent and exercises *quasi*-public employment, and is required to perform the duties it was chartered to perform with the same care, skill and diligence that a prudent man would, under like circumstances, exercise in his own affairs, and it is contrary to public policy to permit it by rules and regulations to restrict its liability for damages resulting from its own negligence or carelessness.

2. The reasonableness or unreasonableness of rules and regulations made by a telegraph company must be determined with reference to public policy, precisely as in the case of common carriers, and a stipulation which exempts such company from damages for its own negligence is void.

3. *Held*, that the evidence in this case shows negligence on the part of the telegraph company, and that the sufficiency of the complaint, not having been challenged by demurrer or upon the introduction of evidence, but being first challenged by a motion for a nonsuit, which is not a ground for a nonsuit, that upon a reversal of this case the plaintiff should be allowed to amend his complaint so as to allege negligence in the transmission of said telegram.

4. The term "gross negligence" is used to denote a degree of carelessness greater than the degree implied by "ordinary negligence," and is sometimes used to denote wilful negligence or fraud.

5. Where a telegraph company fails to transmit a message correctly, the proof of that fact is *prima facie* evidence of the company's negligence.

6. If the failure to correctly transmit a telegram was not the result of the negligence of the company, the means of showing that fact is within the possession of the company, and it may show it as a defense.

7. *Held,* that the evidence shows that said telegram was delivered to the agent of the company for transmission and was accepted by it; that the company made a mistake in its transmission, and that showing made a *prima facie* case in favor of the plaintiff, and the court erred in granting a nonsuit and entering a judgment of dismissal.

8. *Held,* that the contract for the sale of the cattle was made with the commission company.

APPEAL from the District Court of the Fifth Judicial District, for Bear Lake County. Hon. Alfred Budge, Judge.

Action to recover damages for an alleged mistake made by the telegraph company in transmitting a message. Motion for nonsuit was granted and judgment of dismissal entered. *Reversed.*

Thos. L. Glenn, for Appellants.

An error made in a plainly written message, each word distinguishable by the naked eye, is gross negligence, unless some exculpatory evidence is adduced. (2 Joyce on Electric Law, 2d ed., sec. 736; *Western Union Tel. Co. v. Goodbar* (Miss.), 7 So. 214.)

The only defense offered by respondent is that the printed stipulations on the back of the message delivered to respondent by appellants for transmission provided, among other things, that the sender must, to hold the company liable, order the message to be repeated, and pay the company a fee, equal to one-half of the rate for transmission; such stipulations are void as against public policy, and are an outrage on justice.

The usual stipulation as to unrepeated messages is void where the company's negligence is the cause of the damage or loss. (Citing cases found in opinion.)

Clark & Budge, for Respondent.

It cannot be said that appellants contracted with the commission company directly, because the parties did not come to a common understanding. There was no meeting of minds as a result of the telegraphic communications. (*Starks Co. v. Brewer,* 77 Kan. 610, 95 Pac. 402; *Perkins Glass Co. v. Pacific C. & T. Co.* (Cal.), 54 Pac. 101.)

The great weight of authority upholds the right of the company to adopt reasonable rules, regulations and conditions to govern the sender of messages, and which shall control in fixing the liability of the company for delays or mistakes in the transmission or delivery of messages which it receives. (*Primrose v. W. U. Tel. Co.,* 154 U. S. 1, 14 Sup. Ct. 1098, 38 L. ed. 883; *Camp v. W. U. Tel. Co.,* 1 Met. (Ky.) 164, 71 Am. Dec. 461; *Coit v. Tel. Co.,* 130 Cal. 657, 80 Am. St. 153, 63 Pac. 83, 53 L. R. A. 678; *Kiley v. Tel. Co.,* 109 N. Y. 231, 16 N. E. 75; *Grinnell v. Tel. Co.,* 113 Mass. 299, 18 Am. Rep. 485; *U. S. Tel. Co. v. Gildersleeve,* 29 Md. 232, 96 Am. Dec. 519; *Clement v. W. U. Tel. Co.,* 137 Mass. 463; *Wann v. W. U. Tel. Co.,* 37 Mo. 472, 90 Am. Dec. 395; *Becker v. W. U. Tel. Co.,* 11 Neb. 87, 38 Am. Rep. 356, 7 N. W. 868; *Breese v. W. U. Tel. Co.,* 48 N. Y. 132, 8 Am. Rep. 526; *Pegram v. W. U. Tel. Co.,* 97 N. C. 57, 2 S. E. 256; *Passmore v. W. U. Tel. Co.,* 78 Pa. 238; *Aiken v. W. U. Tel. Co.,* 5 S. C. 358; *W. U. Tel. Co. v. Smith,* 3 Wills. Civ. Ct. App. (Tex.) sec. 62; *W. U. Tel. Co. v. Hearne,* 77 Tex. 83, 13 S. W. 970; *Womack v. W. U. Tel. Co.,* 58 Tex. 176, 44 Am. Rep. 614; *W. U. Tel. Co. v. Coggin,* 68 Fed. 137; *Birkett v. Tel. Co.,* 103 Mich. 361, 50 Am. St. 374, 61 N. W. 645, 33 L. R. A. 404; *Jacob v. Tel. Co.,* 135 Mich. 600, 98 N. W. 402; *Riley v. Tel. Co.,* 8 Misc. Rep. 217, 28 N. Y. Supp. 581; *Wheelock v. Postal Tel. Co.,* 197 Mass. 119, 83 N. E. 313, 14 Ann. Cas. 188; *Halsted v. Postal Tel. Co.,* 193 N. Y. 293, 127 Am. St. 952, 85 N. E. 1078, 19 L. R. A., N. S., 1021; *Monsees v. Tel. Co.,* 127 App. Div. 289, 111 N. Y. Supp. 53.)

If negligence is relied upon as a cause of action, it must be alleged. (*Cumberland Telephone & Tel. Co. v. Pierson,*

170 Ind. 543, 84 N. E. 1088; *Pittsburg etc. Ry. Co. v. Schepman,* 171 Ind. 71, 84 N. E. 988; 29 Cyc. 970.)

Appellants simply allege the commission of an error, which so far as we know may have resulted from atmospheric disturbances, or from other cause for which respondent was in no way responsible. If they had alleged negligence in their complaint, they have not proved negligence, but the commission of an error, and such proof in jurisdictions which decline to relieve the company from liability for errors occurring through negligence, as well as in jurisdictions which uphold such stipulations, is not considered sufficient proof of negligence. (*White v. Tel. Co.,* 14 Fed. 710, 5 McCrary, 103; *Becker v. Tel. Co.,* 11 Neb. 87, 38 Am. Rep. 356, 7 N. W. 868; *Tel. Co. v. Hearne,* 77 Tex. 83, 13 S. W. 970; *Sweatland v. Tel. Co.,* 27 Iowa, 433, 1 Am. Rep. 285; *Thompson v. Tel. Co.,* 64 Wis. 531, 54 Am. Rep. 644, 25 N. W. 789; *Halsted v. Tel. Co.,* 193 N. Y. 293, 127 Am. St. 952, 19 L. R. A., N. S., 1021, 85 N. E. 1078; *Womack v. W. U. Tel. Co.,* 58 Tex. 176, 44 Am. Rep. 614; *Breese v. Tel. Co., supra; Aiken v. Tel. Co., supra.*)

SULLIVAN, C. J.—This action was brought by the appellants, as plaintiffs, to recover damages in the sum of $581.17, alleged to have been sustained by reason of an error in the transmission of a telegraphic message delivered by appellants to respondents at the town of Soda Springs, Idaho, on or about March 6, 1907, to be transmitted to parties in Denver, Colo.

The principal issue made by the pleadings was whether the defendant was liable because of a mistake made in the transmission of said telegram. The action was tried by the court and a jury, and at the close of plaintiffs' evidence, counsel for defendant moved for a nonsuit, which motion was granted by the court and judgment of dismissal was entered. The appeal is from said order and the judgment.

The following facts, among others, appear from the record:

The telegraphic message was written upon one of the respondent company's telegraph blanks with all the printed provisions upon said blanks. Said telegraph blank contained

the following matter, to wit: "Western Union Telegraph Company, Incorporated. . . . . Send the following message subject to the terms on back hereof, which are hereby agreed to." The following is the telegram written thereon:

"Soda Springs, Idaho, March 6th, 1907.
"To Colorado Live Stock & Commission Co.,
    Denver Stock Yards, Denver, Colorado.
"Will you honor draft of W. L. White on you in payment of 84 head of steers at three ninety-five per hundred two per cent shrink weighed here.

"STRONG & STARK."

On the face of said telegram the following printed matter occurred: "Read the notice and agreement on the back," and on the back of said telegraph blank appears the following: "All Messages Taken By This Company Are Subject to the Following Terms:

"To guard against mistakes or delays, the sender of a message should order it REPEATED; that is, telegraphed back to the originating office for comparison. For this, one-half the regular rate is charged in addition. It is agreed between the sender of the following message and this Company, that said Company shall not be liable for mistakes or delays in the transmission or delivery, or for non-delivery of any UNREPEATED message, beyond the amount received for sending the same; nor for mistakes or delays in the transmission or delivery, or for non-delivery of any REPEATED message, beyond fifty times the sum received for sending the same, unless specially insured, nor in any case for delays arising from unavoidable interruption in the working of its lines, or for errors in cipher or obscure messages. And this Company is hereby made the agent of the sender, without liability, to forward any message over the lines of any other Company when necessary to reach its destination.

"Correctness in the transmission of a message to any point on the lines of this Company can be INSURED by contract in writing, stating agreed amount of risk, and payment of premiums thereon, at the following rates, in addition to the

usual charge for repeated messages, viz., one per cent. for any distance not exceeding 1,000 miles, and two per cent. for any greater distance. No employee of the Company is authorized to vary the foregoing.

"No responsibility regarding messages attaches to this Company until the same are presented and accepted at one of its transmitting offices; and if a message is sent to such office by one of the Company's messengers, he acts for that purpose as the agent of the sender.

"Messages will be delivered free within the established free delivery limits of the terminal office. For delivery at a greater distance, a special charge will be made to cover the costs of such delivery.

"The company will not be liable for damages or statutory penalties in any case where the claim is not presented in writing within sixty days after the message is filed with the Company for transmission.

"ROBERT C. CLOWRY,
"President and General Manager."

Said telegram was introduced in evidence on the trial and one of the plaintiffs testified as follows:

"No, sir, at the time I delivered the telegram to the defendant, I did not ask that it be repeated; I have reference to plaintiffs' exhibit 'A'; I did not request that it be telegraphed back for comparison. No, I did not offer the telegraph company any additional compensation for such purpose. . . . . We were negotiating the sale with one W. L. White, who was agent for the Colorado Livestock & Commission Company; he was acting as their agent; we agreed to sell the company quite a number of cattle, beef steers. I do not remember the weight of the steers. I have got it down; there were 84 head of steers, they weighed something near 1,000 pounds; we at this time agreed with this agent as to the price per hundred-weight, that is to say, $3.95 per cwt., this was net with two per cent shrink; I agreed with the agent on the price for the cattle and then went and sent a message to the company to find out whether the agent was responsible or not."

In response to said telegram, the following reply was received:

"Denver, Colorado, 3, 6, 1907.
"To Strong & Stark, Soda Springs, Idaho.
"Will honor draft as per telegram if cattle are billed to us.
"COLORADO LIVESTOCK & COMMISSION CO."

It further appears from the testimony that the telegram when delivered to the commission company read $3.25 per hundred-weight, making a difference of seventy cents per hundred-weight between the offer and the acceptance, and that was caused by the mistake made by the respondent in transmitting the telegram from Soda Springs to Denver; and that the steers referred to were delivered to the said W. L. White and shipped by him to the Colorado Livestock & Commission Co. at Denver and that said commission company paid for them at the rate of $3.25 per hundred-weight and refused to pay $3.95 per hundred, as stated in the telegram as delivered to the telegraph company for transmission.

Upon that state of facts, the question is presented whether the telegraph company is liable for the difference of seventy cents per hundred-weight.

The respondent does not deny that a mistake was made, but contends that it is not liable, for the reason that the telegraph blank contained a certain printed stipulation to the effect that the telegraph company should not be liable for a mistake or delay in transmission or delivery of the message, unless the sender ordered it repeated and paid one-half of the regular charge in addition to the regular charge for sending such message, and it is admitted by the appellants that they did not request the respondent to repeat said message.

There appears to be considerable conflict in the various decisions upon the question of the validity of the printed stipulation upon a telegraph blank limiting the liability of the company for mistakes and delays in transmission of messages. In some of the decisions it is held that such stipulations are valid, and in others, that they are not valid and are contrary to public policy.

*Kemp v. Western Union Tel. Co.,* 28 Neb. 661, 26 Am. St. 663, 44 N. W. 1064, held that such stipulations are invalid under a statute which expressly declares that they shall not be binding. In that case there was a mistake made in transmitting the telegram. "8 o'clock" was written in the telegram delivered for transmission, and when delivered it read "10 o'clock." The court held, under sec. 12 of an act relating to telegraph companies, that said company was "liable for the nondelivery of dispatches intrusted to its care and for all mistakes in transmitting messages made by any person in its employ."

In *Western Union Tel. Co. v. Lowrey,* 32 Neb. 732, 49 N. W. 707, the court held under the provisions of said section 12, *supra,* that the plaintiff was entitled to damages for delay in delivering an unrepeated message. It thus appears that the legislature of the state of Nebraska has considered that such stipulations printed on a telegraph message, relieving the company of liability for mistakes in transmitting or delay in delivering messages, were contrary to public policy and settled the matter by enacting a law to that effect.

In Mississippi, Kentucky and Oklahoma, telegraph companies are by law declared to be common carriers, and the supreme courts of those states held that said stipulation above quoted is invalid and unavailing as a defense under the constitution and statute which declared telegraph companies to be common carriers in their line of business and subject to liability as such. (*Postal Tel. & C. Co. v. Wells,* 82 Miss. 733, 35 So. 190; *W. U. Tel. Co. v. Eubanks,* 100 Ky. 591, 66 Am. St. 361, 38 S. W. 1068, 36 L. R. A. 711; *Blackwell M. & E. Co. v. Western Union Co.,* 17 Okl. 376, 89 Pac. 235, 10 Ann. Cas. 855.)

It was held in the Oklahoma case that telegraph companies were liable for the full amount of the loss sustained by reason of their failure properly to deliver messages within a reasonable time, notwithstanding an express stipulation in the contract of carriage that such company shall not be liable for mistakes or delays in the transmission or delivery or for nondelivery of unrepeated messages, beyond the amount received

for sending the same, and that construed in the light of the statutes of Oklahoma, such stipulation is unreasonable and contrary to public policy, and therefore void. In that case the negligence consisted in the unreasonable delay in the delivery of a message.

These decisions proceed upon the theory that telegraph companies are common carriers, made so by the provisions of the constitutions or the statutes in those states.

We have no constitutional or statutory provision in this state that such stipulation is void or that telegraph companies are common carriers. Then the question is presented: What should be the rule in this state as to such rules and regulations in the absence of any constitutional or statutory provisions?

It is contended by counsel for respondent that the great weight of authority upholds the right of the telegraph company to adopt reasonable rules and regulations to govern the sending of messages, and to adopt rules and regulations such as the stipulation under consideration, fixing the liability of the company for delay or mistakes in the transmission or delivery of messages to the sum paid for sending the message; and that said stipulation is a reasonable one. In support of this contention, they cite, with other decisions, *Primrose v. W. U. Tel. Co.*, 154 U. S. 1, 14 Sup. Ct. 1098, 38 L. ed. 883. In that opinion the court declares that telegraph companies are not common carriers except in so far as they are obliged to serve all alike, and that they may protect themselves by stipulations similar to those under consideration in this case. The court said:

"By the regulation now in question, the telegraph company has not undertaken to wholly exempt itself from liability for negligence; but only to require the sender of the message to have it repeated, and pay half as much again as the usual price, in order to hold the company liable for mistakes or delays in transmitting or delivering or for nondelivery of a message, whether happening by negligence of its servants or otherwise.''

That case involved the sending of a message which was in cipher and intelligible only to the sender and his agent to whom it was addressed. The court there holds that telegraph companies resemble railroad companies and other common carriers, in that they are instruments of commerce and in that they exercise a public employment and are therefore bound to serve all customers alike without discrimination; that they have a duty to the public, but that they are not common carriers, that their duties are different and are performed in different ways, that they are not subject to the same liabilities, and that, like common carriers, they cannot contract with their employers for exemption for liabilities occasioned by their own negligence, but that they may by such contracts or by their rules and regulations, brought to the knowledge of their employers, limit the measure of their responsibility to a reasonable extent, and whether their rules are reasonable or unreasonable must be determined with reference to public policy precisely as in the case of a carrier; citing *Southern Express Co. v. Caldwell,* 88 U. S. 264 (21 Wall. 264), 22 L. ed. 556.

In the Primrose case, the court referred to the fact that the telegram did not impart to the telegraph company an important business transaction, and did not indicate that if it were not transmitted correctly pecuniary loss might be incurred. In the case at bar, where it appears that the telegram was legibly written and delivered to the operator, it did impart to the telegraph company that it concerned an important business transaction, and imparted notice to the company to the effect that pecuniary loss might result in case a mistake was made in correctly stating the price per hundred-weight of the cattle referred to. It was not like a cipher telegram that was "nonsense" to the operator. In the Primrose case stress is laid upon the fact that the telegram there involved was in cipher and unintelligible. The only mistake made in that telegram was the change of an "a" to a "u," the telegraphic character for an "a" being a dot and a dash, and for "u," two dots and a dash. In the telegram involved in the case at bar, the word "ninety" was changed to "twenty."

The telegraphic characters for the word "ninety" are as follows: − .   ..   −.   . −   ..   ..   and the word for "twenty" as follows:  −   .−−   .   −.   −   ..   ..

It will be observed from the foregoing that those words. when written out in telegraphic characters are very different, and if the figures were used in sending said telegram, the characters for the figure "9" are −..− and for the figure "2" .:−.., and it was carelessness and negligence for an operator to either send or receive the word "twenty" for the word "ninety" in either figures or words.

Counsel also cites *Camp v. Western Union Tel. Co.,* 1 Met. (Ky.), 164, 71 Am. Dec. 461, where it was held that a person desiring to send a message is admonished by the notice printed across said message that to guard against a mistake in transmission it should be repeated. The court said: "He is also notified that if a mistake occur, the company will not be responsible for it unless the message be repeated. There is nothing unreasonable in this condition."

Counsel also cites *Western Union Tel. Co. v. Carew,* 15 Mich. 525. The court there holds that it would be extremely unjust, considering the small amount of compensation for sending a message, and would effectually put an end to this method of correspondence, to hold them liable for the entire correctness of all messages transmitted or to hold them responsible for all damages which may accrue from an error, especially when only a single transmission, without repeating, is relied upon or paid for; or to deny them all power to make rules and regulations to limit their liability even in the case of repeated messages, and the court says it would be equally unreasonable to require them to repeat a message when they are paid only for a single transmission. Some of the courts have based their decisions on the rule laid down in those cases.

The last two decisions were rendered, one in 1858 and the other in 1867, when telegraphy was in its infancy and in a very imperfect, uncertain condition, and messages could not be sent or received with the correctness and accuracy with which they are sent in the present day with the improved telegraphic machinery and appliances and greater expertness

of operators. The court in the latter case refers to the small amount paid for the transmission of a message, and it was evidently in the mind of the court that telegraph companies were poor, struggling corporations; but experience and history now bears out the statement that telegraph companies have become immensely rich on the "small stipend" charged for sending messages, which would indicate that they are charging a great deal more than it actually costs to transmit such messages and to give them a fair return upon the capital invested in the business. The Michigan court, it seems, was mistaken when it suggested that to hold them liable "would effectually put an end to this method of correspondence," as it is shown that a number of the states have held telegraph companies liable and it has not "effectually put an end to this method of correspondence," as it is used a great deal more at the present time than it ever was before, regardless of the courts holding it liable for damages arising because of its negligence. Telegraphy has been so perfected with its improved machinery, instruments, equipment and appliances that with competent and careful operators telegrams may be sent with accuracy. That being true, telegraph companies should be held to a higher degree of care, fidelity and diligence than could reasonably have been required of them at the dates when the last above cited opinions were rendered, and they should be held to a higher degree of care in sending and delivering telegrams that involve the property rights of either the sender or receiver than perhaps they would be in social telegrams, or telegrams that do not involve property rights and others of particular interest to the sender or receiver. While, under the decision of the United States supreme court above cited, a telegraph company is held not to be a common carrier, it is, however, a corporation doing business for the public, and must be held liable for damages arising from its own carelessness and negligence or the carelessness and negligence of its agents. While it may make rules and regulations in regard to the conduct of its business, the reasonableness or unreasonableness of such rules must be determined with reference to public policy, precisely as in the

case of common carriers. Public policy is that principle of law under which freedom of contract or private dealing is restricted by law for the good of the community—the public good. (32 Cyc. 1251.) A stipulation in a contract which exempts the corporation from damages for its own negligence is void when applied to a telegraph company as well as when applied to a common carrier.

In *Western Union Tel. Co. v. Eubanks*, 100 Ky. 591, 66 Am. St. 361, 38 S. W. 1068, 36 L. R. A. 711, the supreme court of that state has clearly distinguished, if not reversed, the doctrine laid down in *Camp v. Western Union Tel. Co.* (Ky.), 1 Met. 164, 71 Am. Dec. 461, and there holds that a stipulation such as the one under consideration in this case, providing that unless the message is repeated the company is not liable, is invalid, and says:

"It is true that in *Camp v.* this appellant (*Western Union Tel. Co.*), the same or a similar stipulation as the one in question as to the repetition of messages was held to be valid, but that case was decided in 1858, and before the adoption of the present constitution."

In the Eubanks case the decision of the supreme court in *Primrose v. Western Union, supra*, is referred to in the following manner by the court:

"It is true that that decision upheld the stipulation in question as well as the stipulation in regard to cipher messages and obscure messages, but it is also true that Chief Justice Fuller and Mr. Justice Harlan dissented and Mr. Justice White took no part in the decision. It will also be seen from the opinion that many courts of last resort had decided otherwise as to such stipulations," and then cites many other authorities holding that such stipulations are invalid.

In *Smith v. Western Union Tel. Co.*, 83 Ky. 112, 4 Am. St. 126, the court, in discussing the obligation of telegraph companies, said:

"It is, however, a public agent; it exercises a *quasi*-public employment; carefulness and .fidelity are essentials to its character as a public servant, and public policy forbids that it should abdicate as to the public by contract with the in-

dividual. He is but one of millions; his business will perhaps not admit of delay or contest in the courts, and he is *ex necessitate* compelled to submit to any terms which the company might see fit to impose; but the law should not uphold a contract under which a public agent seeks to shelter itself from the consequences of its own wrong and neglect. Its liability for neglect is not founded purely upon contract. It is chartered for public purposes; extraordinary powers are, therefore, conferred upon it; it has the power of eminent domain; if it did not serve the public, it could not constitutionally lay a wire over a man's land without his consent; and by reason of the gift of these privileges it is required to receive and transmit messages, and is liable for neglect, independent of any express contract. The public are compelled to rely absolutely upon the care and diligence of the company in the transaction of this business so wonderful in its growth, so necessary to the life of commerce and useful beyond estimate; and if it relies upon a notice or contract to restrict its liability, it must be one not in violation of public policy; and in view of the vast interests committed to a telegraph company, the extraordinary powers given it and the virtual monopoly it almost necessarily enjoys, the court should compel it *nolens volens* to perform the corresponding duties of diligence and good faith to the public thereby created. Any other rule would defeat the very purposes for which these companies are chartered, to wit: the safe and speedy transmission of messages for the public; and while they may reasonably restrict their liability, yet they cannot do so as against their own negligence. They undertake to exercise a public employment which in many respects is analogous to that of a common carrier, and they must therefore bring to it that degree of skill and care which a prudent man would under the circumstances exercise in his own affairs; and any stipulation by which they undertake to relieve themselves from this duty or to restrict their liability for its nonuse is forbidden by the demands of a sound public policy. To hold otherwise would arm them with a very dangerous power and leave the public comparatively remediless."

As holding or tending to hold that a telegraph company is liable for misconduct or negligence, regardless of said stipulation, see *Western Union Tel. Co. v. Henderson*, 89 Ala. 510, 18 Am. St. 148, 7 So. 419; *Western Union Tel. Co. v. Short*, 53 Ark. 434, 14 S. W. 649, 9 L. R. A. 744; *Western Union Tel. Co. v. Blanchard*, 68 Ga. 299, 45 Am. Rep. 480; *Western Union Tel. Co. v. Tyler*, 74 Ill. 168, 24 Am. Rep. 279; *Western Union Tel. Co. v. Jones*, 95 Ind. 228, 48 Am. Rep. 713; *Sweatland v. Ill. & Miss. Tel. Co.*, 27 Iowa, 433, 1 Am. Rep. 285; *Eubank v. Western Union Tel. Co.*, 100 Ky. 591, 66 Am. St. 361, 38 S. W. 1068, 36 L. R. A. 711; *Ayer v. Western Union Tel. Co.*, 79 Me. 493, 1 Am. St. 353, 10 Atl. 495; *United States Tel. Co. v. Gildersleeve*, 29 Md. 232, 96 Am. Dec. 519; *Shaw v. Postal Tel. Cable Co.*, 79 Miss. 670, 89 Am. St. 666, 31 So. 222, 56 L. R. A. 486; *Reed v. Western Union Tel. Co.*, 135 Mo. 661, 58 Am. St. 609, 37 S. W. 904, 34 L. R. A. 492; *Kemp v. Western Union Tel. Co.*, 28 Neb. 661, 26 Am. St. 363, 44 N. W. 1064; *Western Union Tel. Co. v. Longwill*, 5 N. M. 308, 21 Pac. 339; *Postal Tel. Cable Co. v. Robertson*, 36 Misc. Rep. 785, 74 N. Y. Supp. 876; *Brown v. Postal Tel. Co.*, 111 N. C. 187, 32 Am. St. 793, 16 S. E. 179, 17 L. R. A. 648; *Telegraph Co. v. Griswold*, 37 Ohio St. 301, 41 Am. Rep. 500; *Aiken v. Western Union Tel. Co.*, 5 S. C. 358, 1 Am. Elec. Cas. 121; *Kirby v. Western Union Tel. Co.*, 7 S. D. 623, 65 N. W. 37, 30 L. R. A. 612; *Western Union Tel. Co. v. Mellon*, 100 Tenn. 429, 45 S. W. 443; *Wertz v. Western Union Tel. Co.*, 8 Utah, 499, 33 Pac. 136; *Gillis v. Western Union Tel. Co.*, 61 Vt. 461, 15 Am. St. 917, 17 Atl. 736, 4 L. R. A. 611; *Western Union Tel. Co. v. Reynolds*, 77 Va. 173, 46 Am. Rep. 715; *Beatty Lumber Co. v. Western Union Tel. Co.*, 52 W. Va. 410, 44 S. E. 309; *Thompson v. Western Union Tel. Co.*, 64 Wis. 531, 54 Am. Rep. 644, 25 N. W. 789; *Western Union Tel. Co. v. Cook*, 61 Fed. 624, 9 C. C. A. 680; *Gt. Northwestern Tel. Co. v. Lawrence*, 1 Rapports Judic. de Quebec, 1; also, Joyce on Electric Law, 2d ed., secs. 681, 683, 684, 685, 689, 692, 701, 702, 707, 712.

In summarizing the diversity of decisions as to such stipulations by telegraph companies that text-writer (Joyce) in sec. 716, says:

"It is evident from the preceding decisions that it is impossible to formulate any other than what might well be called a composite rule and inasmuch as the state courts are showing a more decided inclination to adhere to their own precedents, it is doubtful whether as against such precedents a court would follow decisions of other state courts even though they might be deemed to constitute what has been called the weight of authority."

Owing to the fact that many of the decisions which hold that the stipulation under consideration is valid and binding are based upon the decisions of *Camp v. Western Union Tel. Co., supra,* decided in 1858, and *Western Union Tel. Co. v. Carew, supra,* which was decided in 1867, and long before telegraphy had reached its present state of efficiency and accuracy, this court is not inclined to follow that line of decisions. Since telegraph companies are public agents, exercising a *quasi*-public employment, carefulness and fidelity are essentials to its character as a public servant, and public policy forbids that it should be released by its own rules or regulations from damages occasioned by its carelessness and negligence. It is chartered for public purposes; it has the power of eminent domain; the public are compelled to rely absolutely on the care and diligence of the company in the transmission of messages, and by reason of those powers and the relation it sustains to the public, it is obligated to perform the duties it is chartered to perform with the care, skill and diligence that a prudent man would, under like circumstances, exercise in his own affairs, and if it fails to do so, it is liable in damages for such failure, and cannot restrict its liability by rule or regulation which attempts to excuse it for its own negligence. It is a public servant, and must serve the people impartially, carefully and in good faith. We do not hold that the company is an insurer against mistakes or delays arising from causes beyond its own control, but it is liable for damages arising from the use of defective instruments or want of skill or care on the part of operators. A stipulation exempting it from liability for its own negligence would be contrary to public policy.

Some of the authorities hold that a telegraph company may adopt rules and regulations which legally exempt it from "ordinary negligence," but that they cannot make such rules or regulations that will shield or protect them from damages arising from "gross negligence." They draw a distinction between "ordinary negligence" and "gross negligence." Bouvier, in his Law Dictionary, defines negligence to be "The omission to do something which a reasonable man, guided by the considerations which ordinarily regulate the conduct of human affairs would do, or doing something which a prudent and reasonable man would not do." Mr. English, in his Law Dictionary, defines negligence to be "The omission to exercise proper care and caution; failure to perform a duty or doing it improperly, and the facts in such cases must decide the degree of negligence." Thompson on Electricity, sec. 186, referring to the different degrees of negligence, says: "Modern judicial opinion is drifting toward the view that a division of care and correlatively of negligence into degrees is a matter too subtle and refined for the ordinary purpose of justice, and it has been well said that a gross negligence is nothing more than negligence with an epithet."

The term "gross negligence" undoubtedly describes colloquially a greater degree of carelessness than the term "ordinary negligence," but the legal significance of the term is difficult to ascertain. In one view, "gross negligence" is deemed equivalent in law to fraud or to intentional wrong; in another, it is deemed exactly synonymous with ordinary negligence; while in a third it is deemed to be applicable to those degrees of carelessness, whatever they may be, existent between ordinary negligence and wilful negligence or fraud. (Sec. 37, Gray on Communication by Telegraph.) And in sec. 38, the author says: "The doctrine that in a legal contemplation there is no distinction between gross negligence and ordinary negligence has certainly not been adopted uniformly by the courts which have considered negligence on the part of the telegraph company."

In certain cases "gross negligence" is evidently deemed the equivalent in legal contemplation of "ordinary negli-

gence." In many cases, however, "gross negligence" is used to denote a degree of carelessness greater than the degree implied by "ordinary negligence," and one of which the law takes distinct legal cognizance. It is thus used in those cases in which telegraph companies are permitted to limit their liability for losses occurring through their ordinary negligence, but at the same time are not permitted to limit their liability for losses occurring through their gross negligence. Unfortunately, in only one of these cases is an attempt made to define gross negligence or a test offered to distinguish it from either ordinary negligence or fraud. In the rest of these cases, therefore, it is impossible to determine whether gross negligence is deemed to be synonymous with wilful negligence or fraud, or to be applicable only to those degrees of carelessness, whatever they may be, existent between wilful and ordinary negligence.

In the 4th volume of "Words and Phrases," we find the following definitions of "gross negligence" supported by the many authorities cited there: "Gross negligence is the want of even a slight care and diligence." And again "Gross negligence is the want of that diligence that even careless men are accustomed to exercise." And, "Gross negligence is the want of that care which every man of common sense, however inattentive he may be, takes of his own property, and is nothing more than negligence with the addition of a vituperative epithet."

We shall not undertake to add anything to the numerous definitions cited of "negligence" and "gross negligence," but do hold that if damages occur by reason of mistakes made because of defective instruments or incompetent operators, or through carelessness or negligence that with ordinary care might have been avoided, the company is liable. And where it appears that the word "ninety" was erroneously transmitted "twenty," the company is liable unless it can show that the mistake was made under circumstances and conditions over which it had no control. Telegraph companies must therefore be held to a greater degree of care than is included in "wilful negligence" or "fraud."

It is contended by counsel for respondent that the complaint does not allege negligence on the part of the company in making the mistake in sending said telegram, and for that reason does not state a cause of action.   The sufficiency of the complaint, however, was not challenged by demurrer or upon the admissibility of evidence and was only raised upon the motion for a nonsuit.   This, however, is not a ground for a nonsuit.   Sec. 4354, Rev. Codes, provides that an action may be dismissed or a judgment of nonsuit entered on five separate grounds.   None of the first four mentioned applies to the case at bar, but the fifth is applicable and provides that the court upon motion may grant a nonsuit if plaintiff fails to prove a sufficient case for the jury.   It was evidently on that ground that the court sustained the motion for a nonsuit and entered a judgment of dismissal, as it is virtually conceded the court held that said stipulation was valid.   This court holds that the evidence introduced on the trial was sufficient to show negligence; in other words, to make a *prima facie* case, and as the judgment must be reversed and the cause remanded, the plaintiffs should be permitted to amend their complaint, if they desire to do so.   If application had been made at the close of the trial to amend the complaint to conform to the proof, the court no doubt would have granted the application, as under the views expressed in this opinion, the plaintiffs made a *prima facie* case by the evidence introduced.   Where a telegraph company fails to transmit a message correctly, the proof of that fact is *prima facie* evidence of the company's negligence; so proof by the plaintiff of the contract, which may be implied by the delivery of the message to be transmitted and its acceptance by the defendant's agent, and of the breach, makes out a *prima facie* case, and the plaintiff need not go further and show any further negligence or omission of the defendant.   (Jones on Telegraph and Telephone Companies, sec. 36.)   If the failure was not the result of negligence, the means of showing that fact is almost invariably within the exclusive possession of the company, and for the courts to require the sender to prove the negligence, after showing the mistake, would be in many

cases to require an impossibility, not infrequently resulting in enabling the company to evade a just liability. (Sec. 36, *supra*, and authorities there cited.)

We conclude that when the sender delivers a message to the agent of a telegraph company for transmission and it is received by him for transmission, it is clearly implied and understood that the message must be correctly sent, and upon proof that it was not correctly sent, a *prima facie* case is made. Then if the mistake was not occasioned by incompetent operators or defective instruments, and was occasioned by the elements or some matter or thing over which the company had no control, it devolves upon the company to prove that as a matter of defense. Therefore, when the plaintiff proved that said message was delivered to the agents of the company for transmission and that they accepted it and made a mistake in its transmission, the plaintiff had made a *prima facie* case and the court erred in granting a nonsuit and entering a judgment of dismissal.

It is also contended by counsel for respondent that the agreement for the sale of the cattle was made with the agent of the Colorado Livestock & Commission Co., and that by reason of that contract the steers were shipped to said commission company, and that fact would render said company liable for the balance due on said steers at the rate of $3.95 per hundred-weight. There is nothing in that contention, for the reason that the appellants did not close the contract for the sale with White, but closed it with the commission company. The negotiation for the sale of the steers was begun with White, but appellants would not sell them until they communicated with the company by telegraph. In the reply telegram, the company stated that they would honor the draft if the cattle were billed to them. The contract was made directly with the commission company and not with White, and on that state of facts the commission company could not be compelled to pay a greater price than it had agreed to pay as per its reply telegram.

---

Points Decided.

---

The judgment is reversed and the cause remanded for further proceedings in accordance with the views expressed in this opinion.

Costs of appeal are awarded to appellant.

Stewart and Ailshie, JJ., concur.

(June 28, 1910.)

ON REHEARING.

[109 Pac. 917.]

TELEGRAPH COMPANY NOT AGENT OF SENDER — TELEGRAPH COMPANY INDEPENDENT PRINCIPAL—NEGLIGENT ERROR IN TRANSMISSION OF MESSAGE—MEASURE OF DAMAGE.

(Syllabus by the court on rehearing.)

1. A sender of a telegraphic message does not constitute the telegraph company his agent and is not bound to the receiver of the message by the terms of the message as negligently changed or altered by the company.

2. A telegraph company is a public service corporation engaged in a public utility, and in receiving, transmitting, and delivering messages should be treated as an independent principal or contracting party, and be held liable both in contract and tort the same as other principals.

3. Where S. & S. sent a telegram to C. L. S. & C. Co., inquiring if the company would honor draft in payment for 84 head of steers at $3.95 per hundred, and the telegraph company negligently changed or altered the message so that when received at its destination and delivered to the sendee it read $3.25 instead of $3.95, and the stock was shipped and C. L. S. & C. Co. paid therefor at the rate of $3.25, if S. & S. acted prudently and with due diligence after discovering the mistake, so as to minimize the damage and loss, the measure of damage which they will be entitled to recover from the telegraph company for its tort will be the difference between the market value of the stock the day the message was sent and the price actually paid by C. L. S. & C. Co.

Thomas L. Glenn, for Appellants.

The court correctly ruled in its former opinion that the contract was made between the appellants and the livestock and commission company, by means of the telegrams, and not with White or through White as the agent of the livestock company, for the reason that the weight of authority favors the proposition that the telegraph company was the agent of the appellants in the delivery of the message to the livestock company; that the livestock company completed the contract so far as it was concerned by delivering to the respondent a message accepting the offer of appellants, the appellants thereupon complying with the terms of the message of acceptance; the idea of agency of White does not appear in any manner in either of the telegrams; the only evidence, if evidence at all, of such agency is the statement of witness Stark wherein he stated that White represented himself to be the agent of said company, and, if he was agent, he was certainly repudiated by both parties in their telegraphic correspondence. (*Pepper v. W. U. Tel. Co.*, 87 Tenn. 554, 10 Am. St. 699, 11 S. W. 783, 4 L. R. A. 660, and cases cited; *Bond v. Hurd*, 31 Mont. 314, 78 Pac. 580, 3 Ann. Cas. 566; Thompson on Law of Electricity, sec. 496; Joyce on Electric Law, 2d ed., sec. 905; 10 Current Law, 1844.)

Clark & Budge, for Respondent.

The parties were never of the same mind concerning a material element of the contract, to wit, the price, and therefore there was no meeting of minds; therefore there was no contract as a result of the telegrams. Appellants were not bound to deliver the cattle at the price quoted in the telegram as delivered to the commission company, because they never agreed to sell at such a figure. They might have otherwise disposed of the cattle and obtained the highest possible price for them without regard to the telegrams, for the telegrams did not create or give rise to any obligation on the part of the appellants to sell to the commission company at any particular figure. (*Pepper v. Western Union Tel. Co.*, 87 Tenn. 554, 10

Am. St. 699, 4 L. R. A. 660, 11 S. W. 783; *Postal Telegraph Cable Co. v. Schaefer,* 110 Ky. 907, 62 S. W. 1119; *Shingleur v. Telegraph Co.,* 72 Miss. 1030, 48 Am. St. 604, 18 So. 425, 30 L. R. A. 444.)

The cases above cited, and also the case of *Western Union Tel. Co. v. Dubois,* 128 Ill. 248, 15 Am. St. 109, 21 N. E. 4, hold that the sender has an action based upon his contract with the telegraph company for the correct transmission of the message, or an action in tort when he has suffered because of an error, and they also hold that the sendee may sue in tort; but we cannot understand upon what theory appellants can hold the respondent liable for an error when they suffered no damage because of the error. In other words, the error did not affect the binding contract entered into between the appellants and the commission company through the agency of White.

AILSHIE, J.—A rehearing was granted in this case on that particular portion of the original opinion of the court which holds that "the contract was made directly with the commission company and not with White, and on that state of facts the commission company could not be compelled to pay a greater price than it had agreed to pay as per its reply telegram."

On the reargument of this case on the point submitted, the controversy has revolved about the legal proposition as to whether or not a telegraph company in receiving and sending a message acts as the agent of the sender. A determination of this question is necessary to a correct and proper understanding of the principle of law applicable in the determination of the case. We have made a very careful and somewhat extended examination both of the text-writers and the court decisions on this question, and emerge from the investigation fully convinced that the authorities are irreconcilable on the question. This confusion, it seems to us, has arisen out of the endeavor on the part of the courts to determine just what particular settled and established rule of law is applicable and should be invoked in dealing with an entirely

new agency as applied in business and. commerce. This is a. difficulty which constantly confronts the courts. New inventions are constantly coming into use; new uses, both public and private, are coming into being; new methods and means. of transacting and carrying on business are applied; and it. is a problem fraught with many difficulties and embarrassments, as the books will readily disclose, for the courts to apply, in every instance, the correct principle of law so as to accomplish substantial justice to all concerned and at the same time promote the public interests involved.

In the early days of communication by telegraph when cases began to find their way into the English and Scotch courts, it was held by those courts that the law of agency did not apply, and that the company should not be treated as an agent of the sender of a message, but rather as an agency of the government. (*Henkel v. Pape*, 40 L. J. Exch.. 15, L. R. 6 Exch. 7, 23 L. T. 419, 19 W. R. 106; Allen's Tel. Cases, 456; *Verdin v. Robertson,* 10 Ct. Sess. Cas. (3 Series) 35 (Scot. 1871) ; Allen's Tel. Cases, 697. To the same effect,. see *Playford v. Tel. Co.,* L. R. 4 Q. B. 706; S. C., Allen's Tel. Cas. 437; *Dickson v. Tel. Co.,* 2 C. P. Div. 62; S. C., 3 C. P.. Div. 1.) There the telegraph is under the control of the government and is operated in connection with the postoffice department (32 & 33 Vict., c. 73), and the cases were apparently decided on the theory that the government is not responsible for the negligence, errors or mistakes of its clerks and servants. In this country there seems to have been more or less diversity of opinion, some of the cases, and especially the early cases, proceeding upon the implied, if not express, theory that the company is the agent of the sender and that the law of agency is the rule of law to be applied in such cases.

Mr. Gray, in his work on Communication by Telegraph,. written twenty-five years ago, at sec. 104 says: "While the employer of a telegraph company is responsible upon the words of a message as delivered, where they are the ones that he authorized, is he responsible upon them where, owing to the negligence of the company, they differ materially from the ones that he authorized? This question is answered in the

negative in England and in Scotland. In this country, on the other hand, it is answered, as a general rule, in the affirmative.

"Courts have rarely considered at length the relationship between a telegraph company and its employer. The view that the employer of a telegraph company is responsible upon a negligently altered message has been rested, it seems, upon two different grounds: (1) A telegraph company is the agent of its employer; consequently, it renders the employer responsible upon any message which it delivers. (2) One who employs a telegraph company employs it to do a certain act,—to communicate a certain message; consequently, he is responsible for the torts of the company committed in the performance of that act. These grounds will now be considered separately and in order."

In a note to this section the author cites *Durkee v. Vermont C. Rd. Co.*, 29 Vt. 127; *Saveland v. Green*, 40 Wis. 431; *Wilson v. M. & N. W. R. Co.*, 31 Minn. 481, 18 N. W. 291, with the following comment on those cases: "These cases overlook, it seems, the fact that a telegraph company, in delivering an altered message, does an act beyond the scope both of the authority which the employer actually delegates to it, and of the authority that he holds it out as possessing."

Subsequent to the issuance of Gray's work and in 1891, Judge Seymour D. Thompson issued his work on the Law of Electricity, and in sec. 480 says: "In England and Scotland, the idea that the telegraph company is the agent of the sender to transmit his communication to the addressee, is repudiated." In sec. 481 he discusses and reviews the decision of the supreme court of Tennessee in *Pepper v. Western Union T. Co.*, 87 Tenn. 554, 10 Am. St. 699, 11 S. W. 783, 4 L. R. A. 660, 25 Am. & Eng. Corp. Cas. 542, 2 Am. Elec. Cas. 756, and disapproves the holding which he calls "dictum" in that opinion, and in sec. 482 the author says: "It is obvious, however, that the foregoing principle cannot be of universal application. Many cases will arise where the material fact will be, not what was the message which was delivered, but what was the message which was received. The party who originally sends an order by telegraph makes the telegraph com-

pany his *agent* for its transmission and delivery, and, as between himself and the person to whom it is addressed, he is bound by the message *as delivered.* It follows that where the legal rights of the receiver of the message, founded upon an order transmitted therein, are in question, he is entitled to put in evidence the message *actually received* as the original.''

Some seventeen years later, and in 1907, Joyce & Joyce issued the second edition of their work on Electric Law, and in sec. 905 review the conclusion reached by the different text-writers as follows: ''Mr. Gray (Gray on Teleg., sec. 104, note 3) states the rule as holding nonagency of the telegraph company in England, and says that the rule here is contra, although he inclines to the English rule (see, also, Scott & Jarnigan on Teleg., secs. 340, 341). Judge Thompson (Thompson on Electricity, ed. 1891, secs. 483–487) holds to the rule which makes the sender who telegraphs a proposal bound by the terms of the message as delivered, on the ground of agency of the telegraph company. In other words, the sender must stand by the proposition embodied in the message as delivered by his agent, and sue the company for the damages he has sustained by its misfeasance, but he qualifies this by the rule that the party who first invites the use of the telegraphic agency impliedly undertakes to assume the risk of the telegraph company's mistakes. (This author relies upon *Ayer v. Western Union Tel. Co.,* 79 Me. 493, 1 Am. St. 353, 10 Atl. 495, *Western Union Tel. Co. v. Shotter,* 71 Ga. 760, *Dunning v. Roberts,* 35 Barb. (N. Y.) 463, and *Durkee v. Vermont Cent. R. Co.,* 29 Vt. 127, 140.) Mr. Crosswell (Crosswell on Electricity, ed. 1895, secs. 684–687) notes substantially the English rule, and briefly considers the Georgia and Maine cases, and states no rule so far as we can discover.''

Joyce & Joyce state their conclusion in sec. 907 as follows: ''We must confess that we believe there can be no logical deduction from the various principles involved, as to what should be the rule. The determination must contain some element of what is called a 'moral' ground, or must be an arbitrary, absolute one. We favor, however, the rulings in

the Tennessee, and Mississippi cases, but admit there is much force in Judge Thompson's conclusion, although that conclusion might have been in accord with the Tennessee and Mississippi cases if he had had these cases before him.''

The American courts are by no means in harmony over this subject. *Western Union Tel. Co. v. Shotter,* 71 Ga. 760, decided in 1884, held unqualifiedly that the telegraph company is the agent of the sender of a message, and that if the message as actually delivered offers merchandise at a less price than the message as written by the sender offered, and the proposition is accepted, the sender is bound by the contract. This rule seems to have been uniformly adhered to by the Georgia courts. (See *Brooke v. Western Union Tel. Co.,* 119 Ga. 695, 46 S. E. 826; *Western Union Tel. Co. v. Flint River Lumber Co.,* 114 Ga. 576, 88 Am. St. 36, 40 S. E. 815; *Western Union Tel. Co. v. Cooper,* 2 Ga. App. 376, 58 S. E. 517.) The Shotter case has been frequently cited and commented on by the courts and text-writers,—sometimes with approval, sometimes with doubts or express disapproval.

The greater number of cases that have had occasion to consider the question of agency have arisen out of the introduction of evidence, or have in some way involved the question of either what constituted the original message or what was the best evidence. Cases dealing with the admission of evidence or what constituted the best evidence of the original message are *Saveland v. Green,* 40 Wis. 431; *Durkee v. Vermont C. Rd. Co.,* 29 Vt. 127; *Howley v. Whipple,* 48 N. H. 487; *Morgan v. People,* 59 Ill. 58; *Smith v. Easton,* 54 Md. 138, 39 Am. Rep. 355; *Barons v. Brown,* 25 Kan. 410; *Matteson v. Noyes,* 25 Ill. 591; *Cairo & St. Louis R. R. Co. v. Mahoney,* 82 Ill. 73, 25 Am. Rep. 299; *Williams v. Brickell,* 37 Miss. 682, 75 Am. Dec. 88; *State v. Hopkins,* 50 Vt. 316; *Bond v. Hurd,* 31 Mont. 314, 78 Pac. 579, 3 Ann. Cas. 566. ·

*Pepper v. Western Union Tel. Co., supra,* decided by the supreme court of Tennessee in 1889, is perhaps the most widely cited, exhaustive and well-considered American case to repudiate the doctrine that the company is the agent of the sender of the message. This case states the English rule and

reviews the American authorities, and indulges in some independent reasoning and consideration for the rule, and concludes that what is known as the American rule, that the company is the agent of the sender of a message, really rests on the single case of *W. U. Tel. Co. v. Shotter, supra.* The court concludes by repudiating the agency rule and holds the company as an independent principal.

In 1895 the supreme court of Mississippi was confronted with the same question, and in *Shingleur v. Western Union Tel. Co.,* 72 Miss. 1030, 48 Am. St. 604, 30 L. R. A. 444, 18 So. 425, cited, approved and followed the Pepper case, and held that a telegraph company is liable either to the sender or sendee of the message by reason of the delivery of an altered message,—to the sender in contract or tort and to the sendee in tort. This case holds that the liability of a telegraph company for incorrectly transmitting a message and thus delivering an incorrect copy of the original, is that of an "independent principal" to either the sender or sendee, whichever may be injured thereby. The Mississippi court calls attention to the Shotter case and declines to follow it. To same effect see the later Tennessee case of *W. U. Tel. Co. v. Potts,* 120 Tenn. 37, 127 Am. St. 991, 113 S. W. 789, 19 L. R. A., N. S., 479.

In 1901 the Kentucky court of appeals in *Postal Tel. & Cable Co. v. Schaefer,* 110 Ky. 907, 62 S. W. 1119, had under consideration the liability of the sender of a message to comply with the contract proposed by his message where the message had been changed or altered in the transmission and delivered to the sendee in the changed form. The court reviews the authorities at some length and then says: "This exact question was fully considered in the case of *Pepper v. Telegraph Co.,* decided by the supreme court of Tennessee, and reported in 87 Tenn. 554, 10 Am. St. 699, 11 S. W. 783, 4 L. R. A. 661. In that case the court said, viz.: 'The minds of the party who sends a message in certain words, and the party who receives the message in entirely different words, have never met. Neither can, therefore, be bound the one to

the other.' "  To the same effect see *Pegram v. Western Union Tel. Co.,* 100 N. C. 28, 6 Am. St. 557, 6 S. E. 770.

The case of *German Fruit Co. v. Western Union Tel. Co.,* 137 Cal. 598, 70 Pac. 658, 59 L. R. A. 575, is relied upon by respondent as authority for the contention that Strong & Stark could recover the full market value of this property from the commission company notwithstanding the mistake in the telegram, and that there was no meeting of the minds of the parties.  In that case the plaintiff received a telegram from Cornforth & Co. of Denver, Colo., asking for prices on oranges.  The plaintiff thereupon sent the following message: "Offer Los Angeles, San Gabriel, Santa Ana oranges one fifty, Riverside two sixty."  As received, the message read: "Offer Los Angeles, San Gabriel, Santa Ana oranges one fifty, Riverside One sixty."  Cornforth & Co. immediately wired for two carloads of Riverside oranges, which were immediately shipped.  After receiving the oranges they paid the fruit company $1.60 per box and refused to pay any more. The fruit company thereupon sued the telegraph company for the difference between the price quoted and that received under the altered message.  The court cites no authorities and does not consider the question of agency or whether there was a meeting of the minds of the contracting parties.  That case turns wholly upon the finding of the trial court that *Cornforth & Co. knew that there was a mistake in the telegram,* and that Riverside oranges were at that time current on the market at $2.60 per box.  The court held that Cornforth & Co. were liable to the fruit company for the reasonable and market value of the fruit which was $2.60, *and that knowing that there was a mistake in the telegram they were committing a fraud on the fruit company,* and that the fruit company could have and should have recovered the full market price from Cornforth & Co.  The case also inferentially holds that the fruit company could not waive its right to proceed against Cornforth & Co. to collect the market value of the property and thereby minimize the loss to all parties, and instead thereof sue the telegraph company for the differ-

ence and allow the purchaser of the fruit "to get away with a fraudulently acquired advantage" in such a manner. That case turned upon the peculiar facts there involved, and contains no holding contrary to the general principle of law running through the cases heretofore considered. A consideration of this question of agency has been required, and its determination has been necessary in order to ascertain whether the sender of a proposition to buy or sell is bound to the sendee if his proposition is incorrectly delivered. If the company is his agent, then of course he is bound by the contract whether the proposition be delivered as given or not, and in such case the sendee would have to look to the sender for any damages he might sustain, while if no agency exists, there would be no meeting of minds and no contract in a case where the company changed or altered the message making the proposition, and the sendee, if damaged by reason of the delivery of the changed or false message, would be relegated to his action in tort against the company for the wrong committed. If it should be conceded that the company is the agent of the sender of the message, that agency can in no sense extend to the *change* or *alteration* of the message. The agency would be *special and limited* to the identical message authorized by the sender, and the sendee and everyone else has notice that the company has no authority from the sender to deliver to him or to anyone else an *altered or changed message,* or one in any manner different from the one filed in the transmitting office. (See foregoing quotation from Gray's note to text; *Pegram v. Western Union Tel. Co.,* 100 N. C. 28, 6 Am. St. 557, 6 S. E. 770.)

Our consideration of the authorities and of the nature and character of the service rendered by a telegraph company, the public utility it serves and the public character of its existence and the franchise it enjoys, all constrain us to hold that the law of agency is not applicable and that the company cannot be properly held to be the agent of the sender of the message. A telegraph company should rather be treated as an independent principal or contracting party and liable as other principals. These companies are in fact very similar

to common carriers, and ought to be treated by the law as it deals with the common carrier. It is true, as said by many of the authorities, that the company is not expected to take the written message as delivered to it and transport it on the same sheet of paper to the sendee, but that is not the test and is an evasion of the real question. What the sender of a telegraphic message wants and expects is that the *words, figures or characters* of his message,—not the paper containing them,—shall be delivered to the sendee exactly as expressed by him without change or alteration. He asks the company to become the transmitter or carrier of the *inquiry, proposition, news* or *intelligence* contained in his message, and for this purpose makes the contract and pays the toll or rate established. This is the service of a common carrier. The only difference of any consequence which we can discover is that the telegraph company is not an absolute insurer of the literal accuracy of delivery of every message under all circumstances, yet in this the difference is not so great as was supposed twenty-five years ago. Indeed, the books disclose that telegraph companies were not held to anything like the degree of accuracy a few years ago as is now required of them, and this is at once apparent. Telegraphy had not been developed and perfected then to anything like the exactness, either mechanically or scientifically, that it is now.

Having determined that the telegraph company was not the agent of Strong & Stark, it follows that there was no meeting of the minds of the contracting parties as to the price for which the cattle were to be sold, and that Strong & Stark had a right to reclaim the same upon learning of the mistake made in the delivery of their proposition. They received a draft from White, the agent of the commission company, and shipped the cattle, and did not learn that any error had been made in the transmission and delivery of their message until after the draft had been presented and the commission company had refused to pay any greater rate than $3.25 per hundred. While there is no evidence in the record which shows just where the cattle were or what had become of them at the time Strong & Stark received the information of this mistake

and the refusal of the commission company to pay $3.95 per hundred, still it is apparent that they had already been shipped and that they had very likely been received at the stockyards and perhaps sold and possibly butchered. This, of course, is somewhat conjectural from the present record. It is clear, however, that the freight rates and expense of shipping had already been incurred, and that if the shippers should have reclaimed their property they had still incurred a large expense which they must necessarily take into consideration as prudent and reasonable men if they should have refused to allow the commission company to retain the stock at $3.25 per hundred which the latter had promised and agreed to pay. Whatever damage and loss may have been sustained by the sellers of this property on account of the transaction is directly traceable to the tort committed by the telegraph company in delivering to the commission company an altered and false message. As said by the court in *Pepper v. Western Union Tel. Co., supra,* "they [Strong & Stark] were bound to have taken just such steps as a reasonable prudent man would take to save himself had the mistake or error been his own. A man, under such circumstances, is not to be held to have done the wisest and best thing but to the exercise of reasonable skill and diligence. Whether he so acted or not is a question of fact to be left to the jury under proper instructions by the court." The question would necessarily present itself to the sellers of the property the minute they learned of this mistake and of the condition under which the purchasers had accepted the proposition as to what was the best thing to do in order to minimize the loss and damage,— whether it was better to let the purchasers take the property at the price they had proposed to pay and then look to the tort-feasor (the telegraph company) for their damages, or to reclaim the property and seek another purchaser. It may have been impossible to reclaim the property, as it may have been used or consumed or so dissipated that it could not have been found or identified; or the expense of reclaiming it and securing another purchaser might have exceeded by far the difference between the price as named in the proposition and

that named in the message as delivered by the telegraph company to the purchaser.

These questions are all proper matters to be submitted to the jury in ascertaining the damage to be awarded. These phases of the question are very clearly and learnedly discussed and considered in the closing portion of the Pepper case. (See *Hocutt v. Western Union Tel. Co.*, 147 N. C. 186, 60 S. E. 980, and cases there cited.) Since this case must go back for a new trial, it is proper to say here that the measure of damages is not the difference between the price proposed in the telegram delivered by Strong & Stark to the respondent and that given in the message as delivered to the livestock company. On the contrary, the measure of damages in this case would be the difference between the market value of the property on the day of sending the telegram and the price paid by the livestock company in accordance with the telegram as delivered to them. The price of $3.95 as fixed in the telegram filed at Soda Springs may have indicated the correct market price on that day, but since there was no contract made and no meeting of the minds as to the price, it could not be said as a fact in the absence of proof that Strong & Stark could have procured this price for their property, nor can they say with any degree of certainty that the livestock company would have accepted the proposition had the message been delivered quoting that price. It is true, as said in the Pepper case, that this telegram might be taken as *prima facie* evidence that such was the market price on that day. (*Western Union Tel. Co. v. Crawford*, 110 Ala. 460, 20 So. 112; *Bowie v. Western Union Tel. Co.*, 78 S. C. 424, 59 S. E. 66; *Barker v. Western Union Tel. Co.*, 134 Wis. 147, 126 Am. St. 1017, 114 N. W. 440, 14 L. R. A., N. S., 533.)

This brings us to the concluding and ultimate proposition for which the respondent contends in this case, and that is that a contract was in fact made between Strong & Stark and the livestock company independently of the communication by telegraph. White was apparently a purchasing agent for the commission company and was at Soda Springs on the date this telegram was sent. He had been negotiating with the

appellants concerning the purchase of this stock, and the state of the negotiations is given by Stark in his testimony as follows: "On or about the 6th day of March, 1907, we sold to the Colorado Livestock & Commission Company a lot of cattle. We were negotiating the sale with W. L. White who was agent for the Colorado Livestock & Commission Company; he was acting as their agent; we agreed to sell the company quite a number of cattle, beef steers. I do not remember the weight of the steers; they weighed something near 1,000 pounds; we at this time agreed with this agent as to the price per hundred-weight, that is to say, $3.95 per hundred-weight; this was net with two per cent shrinkage; I agreed with the agent on the price for the cattle, and then went and sent a message to the company to find out whether the agent was responsible or not." It will be seen that the respondents up to the time of sending the telegram had been negotiating with the commission company through the medium of their purchasing agent, White. They had apparently reached an agreement as to the terms and conditions of the sale, but the vendors of the stock evidently had some question as to the authority of the agent in some or all respects, and so they sent the telegram set forth in the original opinion in this case. The commission company, on the other hand, instead of advising vendors that they would abide by any agreement made by White, wired the vendors, "Will honor draft as per telegram if cattle are billed to us." The "telegram" referred to in this reply as it had been delivered to the commission company quoted the cattle at $3.25 instead of $3.95 as had been agreed upon by the vendors and White. This communication by wire taking place between Strong & Stark, the vendors of the property, and the commission company, the purchasers, was an attempt at abrogation or modification *by the principals themselves* of the contract which had been entered into by the *principal* on the one hand and the agent of the company on the other. It relegated the parties to the terms of the new or modified contract. It would be quite a different proposition had White been negotiating and contracting with the vendors of this property as a principal himself; in that

case a contract would have been closed and consummated, but since he was dealing as an agent for a principal, and the party with whom he was dealing and his principal subsequently took up the negotiations themselves, they might cancel, affirm or modify the contract as they saw fit, and the subsequent affirmance, modification or cancellation of the contract would be binding on both the principals. The principal could take the matter out of the hands of his agent either in whole or part, and if concurred in by the other contracting party would leave the two contracting parties to the new status to be fixed by them.

We conclude, therefore, that in this case the contract made between Strong & Stark on the one hand as principals and White on the other hand as agent for the commission company was subsequently abrogated by the principals themselves, and that by reason of the tort committed by the telegraph company in altering the communication there was finally no meeting of the minds of the contracting parties.

For the foregoing reasons, the original opinion in this case must stand as the opinion and judgment of the court. The judgment of the trial court must be reversed and the cause remanded with direction to grant a new trial. Costs awarded to appellant.

Sullivan, C. J., concurs.